871 F.2d 1181
 27 Fed. R. Evid. Serv. 849
 UNITED STATES of America, Appellee,
v.
BEECH-NUT NUTRITION CORPORATION, Neils L. Hoyvald, John F.
Lavery, Zeev Kaplansky, Raymond H. Wells, Nina B.
Williamson, South Orange Express, Inc.,
Danny A. Shaeffer, Defendants,
Appeal of Neils L. HOYVALD and John F. Lavery, Defendants-Appellants.
 Nos. 422, 423, Dockets 88-1287, 88-1288.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 5, 1988.
Decided March 29, 1989.
 
 John R. Fleder, Director, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, D.C. (John R. Bolton, Asst. Atty. Gen., Washington, D.C., Andrew J. Maloney, U.S. Atty. for the E.D. of N.Y., Brooklyn, N.Y., Kenneth L. Jost, Atty., Office of Consumer Litigation, U.S. Dept. of Justice, Washington, D.C., David C. James, Thomas H. Roche, Asst. U.S. Attys., Brooklyn, N.Y., on the brief), for appellee.
 Barry S. Simon, Washington, D.C. (Brendan V. Sullivan, Jr., Paul Mogin, John D. Cline, Williams & Connoly, Washington, D.C., on the brief), for defendant-appellant Hoyvald.
 Steven Kimmelman, New York City (James Alexander Burke, Steven Kimmelman, P.C., New York City, on the brief), for defendant-appellant Lavery.
 Before OAKES, Chief Judge, KEARSE and CARDAMONE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Neils L. Hoyvald and John F. Lavery appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York after a jury trial before Thomas C. Platt, Judge. Hoyvald was convicted on 359 counts of introducing adulterated and misbranded apple juice into interstate commerce, in violation of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. Secs. 331(a) and 342(b)(1) and (2) (1982 & Supp. IV 1986). Lavery was convicted on one count of conspiracy, in violation of 18 U.S.C. Sec. 371 (1982), 18 counts of mail fraud, in violation of 18 U.S.C. Secs. 1341 and 2 (1982), and 429 counts of introducing adulterated and misbranded apple juice into interstate commerce, in violation of 21 U.S.C. Secs. 331(a), 342(b)(1) and (2), and 18 U.S.C. Sec. 2. Each defendant was fined a total of $100,000, sentenced to concurrent prison terms of one year and one day on each count on which he was convicted, and ordered to pay the costs of prosecution. On appeal, defendants contend principally that venue as to certain counts was improper and that the district court made a variety of errors in admitting or excluding evidence and in instructing the jury. For the reasons below, we conclude that venue as to the substantive FDCA counts was improper, and we therefore reverse defendants' convictions under 21 U.S.C. Secs. 331(a) and 342(b)(1) and (2) and remand for dismissal of those counts; we affirm Lavery's conviction on the conspiracy and mail fraud counts.
 
 I. BACKGROUND
 
 2
 During the period in question, Lavery was vice president in charge of operations for Beech-Nut Nutrition Corporation ("Beech-Nut" or the "Company"), a company engaged in the business of, inter alia, selling fruit juice products in interstate commerce. As vice president for operations, Lavery was responsible for the purchasing and processing of apple juice concentrates used in Beech-Nut's apple juice and in its "mixed juice" products. Hoyvald was first employed by Beech-Nut in 1980 and became its president and chief executive officer in April 1981. Thereafter, Lavery reported directly to Hoyvald.
 
 
 3
 The government's evidence at trial was presented principally through the testimony of present and former Beech-Nut employees, scientists and investigators employed by the Food and Drug Administration ("FDA"), and expert witnesses, and through documents from the files of Beech-Nut. The evidence, taken in the light most favorable to the government, revealed the following.
 
 A. Events Prior to June 25, 1982
 
 4
 Beech-Nut marketed its apple juice as pure unsweetened juice, labeling and advertising it as pure fruit juice with no sugar added. It made its juices from concentrates. In 1977, Universal Juice Company ("Universal") became its sole supplier of apple juice concentrate. In October 1978, Dr. Jerome LiCari, Beech-Nut's director of research and development, received information suggesting that that concentrate might be adulterated, i.e., might be made of syrups and edible substances other than, and cheaper than, apples. LiCari reported this information to Lavery.
 
 
 5
 In response, Lavery sent two employees to inspect Universal's blending operation. What the employees found, however, was only a warehouse without any blending facility. Lavery did not attempt to determine the location of the blending operation and pursue an inspection. Instead, he required Universal to give the Company a "hold harmless" agreement which was intended to protect Beech-Nut from legal claims related to the juice.
 
 
 6
 Thereafter, as a result of tests, LiCari continued to express to Lavery his concerns about the quality of the concentrate supplied by Universal; he argued that a supplier willing to adulterate the concentrate in the first place would likely have little compunction about continuing to supply adulterated product after signing a hold-harmless document. Lavery's response was that the agreement would adequately protect the Company even if the juice was adulterated.
 
 
 7
 Lavery told LiCari that Universal's price to Beech-Nut for the concentrate was 50 cents to a dollar per gallon below the price charged by the Company's previous supplier. He stated that, because of the tremendous economic pressure under which the Company was operating, he would not change suppliers unless LiCari's tests were sufficient to prove in a court of law that the concentrate was adulterated. He directed LiCari to give the testing low priority. Beech-Nut continued to buy the adulterated concentrate.
 
 
 8
 In 1979, LiCari had the concentrate analyzed by an outside laboratory. The test results showed that the concentrate consisted primarily of sugar syrup. Lavery was informed of these results but took no action. In July 1979, Lavery received a memorandum from the Company's plant manager in San Jose, California, advising him that approximately 95,000 pounds of concentrate inventory was " 'funny' " and "adulterated," in that it was "almost pure corn syrup." (Emphasis in original.) The plant manager suggested that Beech-Nut demand its money back from the supplier. Instead, Lavery, who did not dispute the accuracy of these reports, instructed the manager to use the tainted concentrate in the Company's mixed juices. These too were labeled 100% pure juice. The Company continued to purchase its apple juice concentrate from Universal.
 
 
 9
 On numerous occasions thereafter, Beech-Nut's scientists advised Lavery of their concerns that the apple juice concentrate was adulterated. In August 1981, LiCari sent a memorandum to Charles Jones, the Company's purchasing manager, with a copy to Lavery, stating that although the scientists had not proven that the concentrate was adulterated there was "a tremendous amount of circumstantial evidence" to that effect, "paint[ing] a grave case against the current supplier." LiCari's memorandum concluded that
 
 
 10
 [i]t is imperative that Beech-Nut establish the authenticity of the Apple Juice Concentrate used to formulate our products. If the authenticity cannot be established, I feel that we have sufficient reason to look for a new supplier.
 
 
 11
 Lavery took no action to change suppliers. Rather, he instructed Jones to ignore LiCari's memorandum, criticized LiCari for not being a "team player," and called his scientists "Chicken Little." He threatened to fire LiCari.
 
 
 12
 In late 1981, the Company received, unsolicited, a report from a Swiss laboratory concluding that Beech-Nut's apple juice product was adulterated, stating, "[t]he apple juice is false, can not see any apple." Lavery reviewed this report, and one of his aides sent it to Universal. Universal made no response, and Beech-Nut took no action.
 
 
 13
 Both before and after becoming president of Beech-Nut in April 1981, Hoyvald too received information from several sources about the adulteration problem. In January 1981, LiCari sent copies of a memorandum to Hoyvald and Lavery expressing concern over the quality of the concentrate used to make the apple juice. In November, purchasing manager Jones raised the problem. In the spring of 1982, Paul Hillabush, the Company's director of quality assurance, advised Hoyvald not to be surprised by adverse publicity concerning Beech-Nut's purchases of apple juice concentrate. Hoyvald took no action in response to any of these communications. Rather, he told Lavery that, for budgetary reasons, he would not approve a change in concentrate suppliers until 1983.
 
 
 14
 B. The Events of June 25, 1982, and Thereafter
 
 
 15
 On June 25, 1982, a detective hired by the Processed Apple Institute visited Lavery at the Beech-Nut manufacturing facility in Canajoharie, New York, and advised him that Beech-Nut was about to be involved in a lawsuit as a result of its use of adulterated concentrate and that adverse publicity would ensue. Lavery immediately terminated Beech-Nut's relationship with Universal.
 
 
 16
 Lavery dealt with the adulterated concentrate on hand in two ways. He promptly ordered that so much of Beech-Nut's inventory of concentrate as was located in New York be returned to Universal or destroyed. As to the inventory of concentrate located in San Jose, California, however, he allowed the California plant to continue to use it in manufacturing apple juice products.
 
 
 17
 In addition to the concentrate in New York and California, Beech-Nut had in June 1982 an inventory worth millions of dollars of finished apple products already made from the adulterated concentrate. Hoyvald realized that an inability to sell this inventory would be financially crippling to the Company, and accordingly undertook delaying tactics designed to give the Company time to sell it.
 
 
 18
 To avoid seizure of the inventory in New York by state officials in August 1982, Hoyvald had this juice moved out of state during the night. It was transported from the New York plant to a warehouse in Secaucus, New Jersey, and the records of this shipment and others were withheld from FDA investigators until the investigators independently located the carrier Beech-Nut had used. While the FDA was searching for the adulterated products but before it had discovered the Secaucus warehouse, Hoyvald ordered virtually the entire stock in that warehouse shipped to Beech-Nut's distributor in Puerto Rico; the Puerto Rico distributor had not placed an order for the product and had twice refused to buy the product even at great discounts offered personally by Hoyvald.
 
 
 19
 Similarly, in September 1982, Hoyvald ordered a rush shipment of the inventory of apple juice products held at Beech-Nut's San Jose plant, and took a number of unusual steps to get rid of the entire stock. He authorized price discounts of 50 percent; the largest discount ever offered theretofore had been 10 percent. Hoyvald insisted that the product be shipped "fast, fast, fast," and gave a distributor in the Dominican Republic only two days, instead of the usual 30, to consider and respond to this product promotion. Further, in order to get the juice out of the warehouse and out of the country as quickly as possible, the Company shipped it to the Dominican Republic on the first possible sailing date, which was from an unusually distant port, thereby raising the freight cost to a level nearly equal to the value of the goods themselves. Finally, this stock was shipped before Beech-Nut had received the necessary financial documentation from the distributor, which, as one Beech-Nut employee testified, was "tantamount to giving the stuff away."
 
 
 20
 Hoyvald also used Beech-Nut's lawyers to help delay the government investigation, thereby giving the Company more time to sell its inventory of adulterated juice before the product could be seized or a recall could be ordered. For example, in September 1982, the FDA informed Beech-Nut that it intended to seize all of Beech-Nut's apple juice products made from Universal concentrate; in October, New York State authorities advised the Company that they planned to initiate a local recall of these products. Beech-Nut's lawyers, at Hoyvald's direction, successfully negotiated with the authorities for a limited recall, excluding products held by retailers and stocks of mixed juice products. Beech-Nut thus eventually agreed to conduct a nationwide recall only of apple juice, and by the time of the recall Hoyvald knew that more than 97 percent of the earlier stocks of apple juice had been sold. The Company continued to sell its mixed juice products made from the tainted concentrate until March 1983. In December 1982, in response to Hoyvald's request, Thomas Ward, a member of a law firm retained by Beech-Nut, sent Hoyvald a letter that summarized the events surrounding the apple juice concentrate problem as follows:
 
 
 21
 From the start, we had two main objectives:
 
 
 22
 1) to minimize Beech-Nut's potential economic loss, which we understand has been conservatively estimated at $3.5 million, and
 
 
 23
 2) to minimize any damage to the company's reputation.
 
 
 24
 We determined that this could be done by delaying, for as long as possible, any market withdrawal of products produced from the Universal Juice concentrate....
 
 
 25
 .... In spite of the recognition that FDA might wish to have Beech-Nut recall some of its products, management decided to continue sales of all such products for the time being.... The decision to continue sales and some production of the products was based upon the recognition of the significant potential financial loss and loss of goodwill, and the fact that apple juice is a critical lead-in item for Beech-Nut.
 
 
 26
 Since the mixed fruit juices and other products constituted the bulk of the products produced with Universal concentrate, one of our main goals became to prevent the FDA and state authorities from focusing on these products, and we were in fact successful in limiting the controversy strictly to apple juice.
 
 C. The Present Prosecution
 
 27
 In November 1986, Beech-Nut, Hoyvald, and Lavery, along with Universal's proprietor Zeev Kaplansky and four others (Kaplansky and these four referred to hereafter as the "suppliers"), were indicted on charges relating to the Company's sale of adulterated and misbranded apple juice products. Hoyvald and Lavery were charged with (A) one count of conspiring with the suppliers to violate the FDCA, 21 U.S.C. Secs. 331(a), (k), and 333(b) (1982 & Supp. IV 1986), in violation of 18 U.S.C. Sec. 371; (B) 20 counts of mail fraud, in violation of 18 U.S.C. Secs. 1341 and 2; and (C) 429 counts of introducing adulterated and misbranded apple juice into interstate commerce, in violation of 21 U.S.C. Secs. 331(a) and 333(b) and 18 U.S.C. Sec. 2. The suppliers were also charged with introducing adulterated concentrate into interstate commerce; Hoyvald and Lavery were not charged with any substantive offense regarding the concentrate itself, either directly or as aiders and abettors.
 
 
 28
 Hoyvald and Lavery pleaded not guilty to the charges against them. Eventually, Beech-Nut pleaded guilty to 215 felony violations of Secs. 331(a) and 333(b); it received a $2,000,000 fine and was ordered to pay $140,000 to the FDA for the expenses of its investigation. Kaplansky and the other four supplier-defendants also eventually pleaded guilty to some or all of the charges against them. Hoyvald and Lavery thus went to trial alone.
 
 
 29
 Prior to trial, Hoyvald and Lavery made various motions, including (1) a motion to dismiss the substantive FDCA counts against them on the ground that none of the acts on which those counts were based occurred in the Eastern District of New York, and hence venue was improper; and (2) a motion to dismiss the conspiracy count on the ground that it pleaded two conspiracies rather than a single conspiracy. In an opinion reported at 659 F.Supp. 1487 (1987), the district court denied both motions. It denied the venue motion on the ground that, since transportation is necessary for the "introduction" of goods into commerce, the FDCA offenses were continuing crimes under 18 U.S.C. Sec. 3237(a) (1982 & Supp. IV 1986) and venue was thus proper in any district in which the offenses were begun, continued, or completed. It denied the motion to dismiss the conspiracy count, finding that the indictment adequately alleged a single conspiracy albeit with multiple objectives.
 
 
 30
 The trial began in November 1987 and continued for three months. The government's evidence included that summarized above. Hoyvald's principal defense was that all of his acts relating to the problem of adulterated concentrate had been performed on the advice of counsel. For example, there was evidence that the Beech-Nut shipment of adulterated juices from its San Jose plant to the Dominican Republic followed the receipt by Hoyvald of a telex sent by Sheldon Klein, an associate of the law firm representing Beech-Nut, which summarized a telephone conference between Beech-Nut officials and its attorneys as follows:
 
 
 31
 We understand that approximately 25,000 cases of apple juice manufactured from concentrate purchased from Universal Juice is [sic ] currently in San Jose. It is strongly recommended that such product and all other Universal products in Beech-Nut's possession anywhere in the US be destroyed before a meeting with [the FDA] takes place.
 
 
 32
 Hoyvald and Klein testified that they had a follow-up conversation in which Klein told Hoyvald that, as an alternative, it would be lawful to export the adulterated apple juice products.
 
 
 33
 At the close of the evidence, two counts of mail fraud were dismissed at the government's request; the remaining counts were submitted to the jury. The jury returned a verdict of guilty on all of the counts against Lavery. It returned a verdict of guilty against Hoyvald on 359 counts of adulterating and misbranding apple juice, all of which related to shipments after June 25, 1982. It was unable to reach a verdict on the remaining counts against Hoyvald, which related to events prior to that date. These appeals followed.
 
 II. DISCUSSION
 
 34
 On appeal, defendants contend principally (1) that the Eastern District of New York was not a proper venue for prosecution of the substantive counts under the FDCA; (2) that the court improperly curtailed their presentation of evidence in support of their advice-of-counsel defense; and (3) that the court failed to give the jury proper instructions with respect to that defense and with respect to the matter of conscious avoidance. In addition, Lavery contends that the proof at trial did not substantiate the charge that he and Beech-Nut's suppliers were members of a single conspiracy to violate the FDCA; both defendants contend that that their rights under the Speedy Trial Act, 18 U.S.C. Sec. 3161 et seq. (1982 & Supp. IV 1986), were violated and that the court made various other errors in the admission of evidence or the conduct of the trial. We have considered all of the arguments made by defendants on these appeals and find merit only in the contention that venue as to the substantive FDCA counts was improper.
 
 A. Venue as to the Substantive FDCA Counts
 
 35
 Appellants argue that their convictions on the substantive FDCA counts must be reversed because the government did not show that venue in the Eastern District of New York was proper. For the reasons below, we are constrained to agree.
 
 
 36
 The Sixth Amendment to the Constitution provides that the accused in a criminal prosecution has the right to be tried in the "district wherein the crime shall have been committed." See also Fed.R.Crim.P. 18. The burden is on the government to prove that the crime was committed in the district in which the prosecution is brought, see, e.g., United States v. Potamitis, 739 F.2d 784, 791 (2d Cir.), cert. denied, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984); United States v. Panebianco, 543 F.2d 447, 455 (2d Cir.1976), cert. denied, 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977), and when a defendant is charged in more than one count, venue must be proper with respect to each count, see, e.g., United States v. Bozza, 365 F.2d 206, 220-22 (2d Cir.1966); United States v. Davis, 666 F.2d 195, 198 (5th Cir. Unit B 1982).
 
 
 37
 When a crime consists of a single noncontinuing act, it is "committed" in the district where the act is performed. See, e.g., United States v. Anderson, 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946); United States v. Busic, 549 F.2d 252, 259 (2d Cir.1977). When a crime is an offense that is not unitary but instead spans space or time, it may be governed by 18 U.S.C. Sec. 3237(a), which provides that,
 
 
 38
 [e]xcept as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be ... prosecuted in any district in which such offense was begun, continued, or completed.
 
 
 39
 That section goes on to provide that "[a]ny offense involving ... transportation in interstate or foreign commerce ... is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be ... prosecuted in any district from, through, or into which such commerce ... moves." Id.
 
 
 40
 If the federal statute defining an offense does not indicate explicitly where Congress believes the criminal act is committed, "the locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." United States v. Anderson, 328 U.S. at 703, 66 S.Ct. at 1216. "It is, of course, necessary in order to decide where the crime is committed to ascertain what duty it was, the failure to perform which constitutes the crime, and also what acts of the defendant constituted the violation." Id. at 705, 66 S.Ct. at 1217. Accordingly, we have stated that
 
 
 41
 the test [for constitutional venue] is best described as a substantial contacts rule that takes into account a number of factors--the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding,
 
 
 42
 United States v. Reed, 773 F.2d 477, 481 (2d Cir.1985), and we have noted that it is helpful to examine the "key verbs" used by the statute in defining the offense, United States v. Chestnut, 533 F.2d 40, 46-47 (2d Cir.), cert. denied, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976).
 
 
 43
 The substantive FDCA provision at issue here prohibits, in pertinent part, "[t]he introduction or delivery for introduction into interstate commerce of any food ... that is adulterated or misbranded." 21 U.S.C. Sec. 331(a). The offense described by this section consists of "put[ting] into the stream of interstate commerce adulterated or misbranded" food, United States v. Dotterweich, 320 U.S. 277, 284, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943), or the "send[ing of] illicit goods across state lines," id. at 285, 64 S.Ct. at 138. Although the offense is committed at the moment the goods are "introduc[ed]" or "put" into commerce, we do not view the terms "introduction" and "delivery for introduction" as limited to the physical act of shipping the goods from the original warehouse or plant of the manufacturer. Rather, deeming those terms to encompass also acts of the defendant that cause or direct the shipment of the goods, we have held that venue is proper in a district from which the defendant caused the unlawful introduction of goods into commerce, even though the physical shipment commenced from a different district. United States v. Taller, 394 F.2d 435, 437-38 (2d Cir.), cert. denied, 393 U.S. 839, 89 S.Ct. 115, 21 L.Ed.2d 109 (1968).
 
 
 44
 The district court, noting that Sec. 3237 includes as continuing offenses those crimes that "involv[e]" transportation, and that the shipment of goods in commerce plainly involves transportation, concluded that Sec. 331(a) defines an offense that is "continuing." See 659 F.Supp. at 1493-94. Though this interpretation may be correct, we need not decide in this case whether a Sec. 331(a) violation is a continuing offense within the meaning of Sec. 3237, for the effect of Sec. 3237 is to make an offense triable "in any district in which such offense was begun, continued, or completed," or "in any district from, through, or into which such commerce ... moves," 18 U.S.C. Sec. 3237, and these provisions do not encompass the actions of Hoyvald and Lavery that were proven at the trial of the present case.
 
 
 45
 Unlike the defendant in United States v. Taller, neither Hoyvald nor Lavery was shown to have conducted business from the Eastern District of New York. So far as appears from the record, these defendants were not present in that district but rather operated either from Beech-Nut's corporate headquarters in Pennsylvania, or from its juice manufacturing operation in Canajoharie in the Northern District of New York. Thus, though Hoyvald and Lavery were shown to have caused the introduction of adulterated juice into interstate commerce, that introduction was not caused by them from the Eastern District. Hence, it does not appear that their substantive FDCA offenses were begun, continued, or completed in the Eastern District of New York.
 
 
 46
 Further, there was no suggestion in the record that Beech-Nut had any facility for the fabrication, storage, or shipment of apple juice in the Eastern District. Insofar as the juice was fabricated in New York, that occurred in the Northern District, and the juice was shipped from that district. Nor was there any proof that the juice in question was shipped "into" the Eastern District of New York. And though the documents revealed many destinations for the juice, including cities in New Jersey, Connecticut, Vermont, and Massachusetts, there was no evidence that in order to reach its destination from Canajoharie, any of the juice traveled "through" the Eastern District of New York. Thus, there was no proof of a factual predicate for deeming this a prosecution "in any district from, through, or into which [the adulterated and misbranded juice] ... move[d]."
 
 
 47
 The government argues that prosecution in the Eastern District was permissible because Universal and its brokers were located in the Eastern District, and defendants' subordinates (1) telephoned the brokers to place orders for the adulterated apple juice concentrate, and (2) mailed confirmations for these concentrate orders into the Eastern District. We disagree, for these communications were not part of the offense of introducing the offending juice into commerce but were merely prior and preparatory to that offense. Whether the crime be continuing or noncontinuing, venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense. See, e.g., United States v. Bozza, 365 F.2d at 220-21 (noncontinuing crime of receipt of stolen goods); United States v. Davis, 666 F.2d at 200 (continuing crime of possession of drugs with intent to distribute).
 
 
 48
 Bozza involved a prosecution in the Eastern District of New York for, inter alia, the noncontinuing offense of receipt of stolen goods. The only connection of the alleged receiver of the goods with that district was that he had gone there for an unspecified purpose and had made and received calls there to arrange a meeting and negotiate price with respect to the goods; he had then gone from the Eastern District to the Southern District, where he actually received the stolen goods. We concluded that venue in the Eastern District as to this count was improper. We noted that
 
 
 49
 the cases draw a distinction between a continuing offense which is "held, for venue purposes, to have been committed wherever the wrongdoer roamed," ... and "a single act which occurs at one time and at one place in which only it may be tried, although preparation for its commission may take place elsewhere."
 
 
 50
 365 F.2d at 220 (citations omitted). We rejected the government's contention that "the making of a contract to receive [w]as the 'beginning' of a receiving," id., concluding instead that an act that was merely preparatory to the offense was not part of the offense. See also United States v. Chestnut, 533 F.2d at 47 (court must "decide 'when the defendant's actions have progressed to the point where a court can confidently conclude that [the offense in question] has been committed' ") (quoting United States v. Bithoney, 472 F.2d 16, 23 (2d Cir.), cert. denied, 412 U.S. 938, 93 S.Ct. 2771, 37 L.Ed.2d 397 (1973)). In Bozza, we concluded that
 
 
 51
 [t]o such extent as the issue is doubtful, it is best to resolve the doubt in favor of a construction which will ensure trial where witnesses to the receiving are more likely to be present; otherwise the mere happenstance of a telephone call from a district, possibly remote, where a defendant chanced to be, could deprive him of the protection of the Sixth Amendment.
 
 
 52
 365 F.2d at 221.
 
 
 53
 The principle that preparatory acts alone are insufficient to support venue applies also to continuing offenses. Though Sec. 3237 traces an offense from inception to completion, its thrust is entirely forward-looking; it contains no retrospective provision establishing venue in a district in which the defendant performed only acts that preceded the inception of the offense. In United States v. Davis, 666 F.2d at 199-200, the defendants were prosecuted in the Middle District of Georgia for possession of narcotics with intent to distribute, a crime that may be a continuing offense within the meaning of Sec. 3237. They argued that venue on that count was improper because the narcotics had never physically entered that district. The government contended that venue was proper because the defendants had made arrangements while in that district for the acquisition of the drugs and had intended that the drugs be returned to that district for ultimate distribution at the street level. The Fifth Circuit rejected the government's contentions and reversed for improper venue because the offense itself had not been committed in that district. Like the Fifth Circuit, we find no authorization in Sec. 3237 for venue in a district whose sole connection with the offense in question is that it was a site of preparation for the offense.
 
 
 54
 These principles require that we reverse the convictions of Hoyvald and Lavery on the substantive FDCA counts. The mailings and telephone calls into the Eastern District, relied on by the government, were orders for concentrate that would later be used in Beech-Nut's fabrication of apple juice and thus were merely preparatory to the eventual introduction of the juice into commerce. Though the orders for the adulterated concentrate were undoubtedly acts in furtherance of the conspiracy, they were not part of the substantive Sec. 331(a) offenses with which Hoyvald and Lavery were charged. Plainly if the trial record contained evidence only of defendants' orders for the concentrate, the proof would be insufficient to support a conviction for introduction of the juice eventually made from the concentrate. And if the record contained no evidence of the orders for the concentrate, it would nonetheless contain sufficient proof of the unlawful introduction of adulterated juice.
 
 
 55
 In sum, we conclude that the substantive FDCA offenses with which Hoyvald and Lavery were charged were not committed, or even begun, in the Eastern District of New York, and that the inclusion of those charges in the present prosecution violated their constitutional venue rights. Accordingly, we reverse their convictions on the substantive FDCA counts, and remand for dismissal of those counts.
 
 
 56
 B. The Challenge to the Charge of a Single Scheme or Conspiracy
 
 
 57
 Count 1 of the indictment alleged that all of the defendants had, with intent to defraud, participated in a single conspiracy to violate the FDCA's prohibition against the introduction of adulterated and misbranded foods in interstate commerce. Counts 2-21 alleged that all defendants had used the mails in furtherance of their fraudulent scheme. Lavery contends that he is entitled to reversal of his convictions for mail fraud and conspiracy because there was no proof that there was a single agreement to which both Lavery and the concentrate suppliers were parties. He argues that the evidence showed at best two separate schemes--one to introduce adulterated concentrate and the other to introduce adulterated juice--and that since the suppliers' aim was to defraud Beech-Nut, as a matter of law there could not have been a conspiracy between Lavery and the suppliers. We disagree.
 
 
 58
 The gist of conspiracy is, of course, agreement. In order to support a conviction for conspiracy, the evidence must be sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent. See, e.g., United States v. Alessi, 638 F.2d 466, 473 (2d Cir.1980). When a conspiracy has been charged, the alleged coconspirators' actions may be assessed in light of their "interrelationship and interdependency" as well as "the nature and duration of the enterprise." United States v. Alessi, 638 F.2d at 473. Though accidentally parallel action is not enough to establish a conspiracy, and a mere buyer-seller relationship is not necessarily a conspiracy, a defendant may be deemed to have agreed to join a conspiracy
 
 
 59
 if there is something more, some indication that the defendant knew of and intended to further the illegal venture, that he somehow encouraged the illegal use of the goods or had a stake in such use.
 
 
 60
 United States v. Zambrano, 776 F.2d 1091, 1095 (2d Cir.1985).
 
 
 61
 The agreement needed to support a charge of conspiracy need not be explicit but may be tacit. See Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). If buyer and seller deal in a commodity that has limited legal uses, the very nature of the commodity may help to establish the parties' knowledge of and intent "to further, promote, and cooperate" in the illegal scheme. Id. at 711, 63 S.Ct. at 1269. Other aspects of the dealings between the parties, such as discounts, quantity sales, and a prolonged relationship, can also aid in proving that "[t]here is more than suspicion, more than knowledge ..., [that t]here is informed and interested cooperation." Id. at 713, 63 S.Ct. at 1270.
 
 
 62
 A single conspiracy, rather than multiple conspiracies, may be found where the coconspirators had a " 'common purpose.' " United States v. Heinemann, 801 F.2d 86, 91-92 (2d Cir.1986) (quoting Kotteakos v. United States, 328 U.S. 750, 769, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946)), cert. denied, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). Nonetheless, the participants' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at " 'cross purposes.' " United States v. Heinemann, 801 F.2d at 92 & n. 1 (quoting United States v. Camiel, 519 F.Supp. 1238, 1244 (E.D.Pa.1981), aff'd, 689 F.2d 31 (3d Cir.1982)); see also United States v. Bagaric, 706 F.2d 42, 63 (2d Cir.1983) (coconspirators need not agree on details of conspiracy, where essential nature of plan is agreed on), cert. denied, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983).
 
 
 63
 The matter of whether the evidence has established one conspiracy or more than one is a question of fact for a properly instructed jury. E.g., United States v. Alessi, 638 F.2d at 472. In assessing the contention that the evidence was insufficient to support the jury's conclusion that there was a single conspiracy, we must view the evidence as a whole in the light most favorable to the government, see Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir.1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and uphold the verdict if, viewed in that light, a rational juror could have concluded beyond a reasonable doubt (1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness of its general nature and extent. In reviewing a verdict of guilty, "we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." United States v. LeRoy, 687 F.2d 610, 616 (2d Cir.1982), cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983); see United States v. Tropiano, 418 F.2d 1069, 1074-75 (2d Cir.1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970). In the present case, we find no error in the instructions on conspiracy nor any insufficiency in the evidence.
 
 
 64
 The jury was properly instructed that it must find a single conspiracy among Lavery and the suppliers in order to convict Lavery; it was instructed as to certain characteristics of multiple conspiracies, such as incompatible purposes; and it was told that it must acquit if it found the latter rather than the single conspiracy alleged in the indictment. Though Lavery asked the court to instruct the jury also that he could not be found guilty of conspiring with the suppliers if the jury found that the suppliers sought to defraud Beech-Nut, the court's refusal to give that charge was not error, for the requested instruction does not accurately reflect the law. "That certain defendants were eager to cheat each other for a large slice of the spoils does not obscure the unifying means used by all of them to defraud the public...." United States v. Finkelstein, 526 F.2d 517, 522 (2d Cir.1975), cert. denied, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976).
 
 
 65
 The evidence was ample to permit the jury to infer that Lavery conspired with the suppliers to perpetrate a fraud on the public through the distribution of the adulterated juice. The record included proof of Lavery's nonpursuit of any examination of Universal's blending facility; his refusal to heed the warnings of Beech-Nut's own staff (e.g., indicating that the Universal concentrate was largely sugar syrup) and the warnings of independent scientists (e.g., stating that the apple juice concentrate contained no discernible apple juice); his directions to his scientific staff to make analysis of the concentrate a low priority item; and his directions to his purchasing manager to ignore the warnings of the scientists.
 
 
 66
 Further, it was plain that Lavery knew the Company was paying substantially less for the concentrate it bought from these suppliers than it had for the concentrate previously obtained from reputable suppliers; during the period 1979-1982, Lavery repeatedly told LiCari and others that the price Universal was charging Beech-Nut was 50 cents to a dollar per gallon below the price charged by Beech-Nut's former supplier. This was the very reason Lavery gave his subordinates for not wanting to change suppliers. Lavery conceded to the Processed Apple Institute detective in June 1982 that the fact that Universal's price was "very substantially below the market" could have caused one to be "suspicious" of the quality of the concentrate. In addition, there was evidence that Lavery lied to state officials during their investigation, seeking to conceal his knowledge of this ground for suspicion. Thus, in 1983, when he was called to appear before the New York State Department of Agriculture and Markets, Lavery testified, notwithstanding his past repeated fiscal remonstrations to his subordinates, that he was unaware that the price Beech-Nut had been paying was below market.
 
 
 67
 In sum, the evidence was ample to permit the properly instructed jury to infer that Lavery and the concentrate suppliers were participants in a single scheme of passing off bogus substances as 100% pure fruit juice.
 
 C. The Advice-of-Counsel Defense
 
 68
 In support of the defense that their conduct was not criminal because they acted upon the advice of counsel, defendants proffered, inter alia, testimony by Hoyvald, Beech-Nut's attorney Klein, and Richard Morey, an attorney whose firm was retained by Klein's firm for its expertise in food-and-drug matters. Though much of the evidence proffered in support of this defense was admitted, the court refused to permit Klein and Morey to testify to the substance of the conversations between themselves to which Hoyvold was not a party, including Klein's statements to Morey as to advice sought by Hoyvald and Morey's statements to Klein as to what acts were permissible; and it excluded the attorneys' notes and time records. Hoyvald urged the admission of the two excluded categories of proof as (a) the best evidence of what had occurred at the time the advice was being given, (b) evidence of the information then available to the attorneys, (c) corroboration for Klein's testimony regarding the advice he gave Hoyvald, (d) proof of prior consistent statements made by Klein, to show that Klein's testimony was not recently fabricated, and (e) proof of the states of mind of Morey and Klein.
 
 
 69
 The trial judge viewed the proffered conversations between the lawyers as hearsay and as irrelevant because they would show "the state of mind of the lawyers" rather than the state of mind of Hoyvald. He concluded that even if they were relevant, they presented the danger of confusing the jury as to whose state of mind was in issue. He excluded the attorneys' time records and notes on the ground that, given the attorneys' testimony, the documents would be cumulative. Though we might disagree with the court's characterization of some of this evidence as hearsay, we see no reversible error.
 
 
 70
 Rule 403 of the Federal Rules of Evidence gives the trial court broad discretion to exclude even relevant evidence if its probative value is substantially outweighed by the danger of confusion of the issues or if it would be needlessly cumulative. Fed.R.Evid. 403; United States v. Carter, 801 F.2d 78, 83 (2d Cir.), cert. denied, 479 U.S. 1012, 107 S.Ct. 657, 93 L.Ed.2d 712 (1986); see United States v. Martinez, 775 F.2d 31, 37 (2d Cir.1985). In light of the testimony that was admitted, we find no abuse of discretion in the exclusion of the remaining evidence as irrelevant, confusing, and cumulative.
 
 
 71
 The evidence that was admitted encompassed all elements of the advice-of-counsel defense. Thus, Hoyvald described the information he had given the attorneys and all of the advice he had received from all of the attorneys. The latter included the advice from Klein on September 1, 1982, that the juice in the Secaucus warehouse could lawfully be shipped to Puerto Rico, and the advice on September 15, 1982, that Hoyvald could ship the juice then in the San Jose plant. Klein too was permitted to describe all of the advice he gave to Hoyvald. Klein also testified that he repeatedly consulted Morey and other attorneys. The court allowed both Klein and Morey to testify to the fact that they had repeatedly conversed and that advice given by Klein to Hoyvald followed conversations of Klein with Morey. Hoyvald was permitted to testify that Morey was the source of the advice he was given by Klein on September 1 and 15.
 
 
 72
 In addition, the court permitted Klein, during his testimony, to use his original notes and time records to refresh his recollection. Further, though it did not admit the physical records into evidence, it allowed extensive testimony concerning the time sheets later identified by the defense as the most important, and allowed them to be read verbatim to the jury.
 
 
 73
 In light of the record as a whole, we find no abuse of discretion in the trial court's decision to exclude the substance of the Klein-Morey conversations and the attorneys' documents on the ground that their relevance, if any, was outweighed by their propensity for confusion and their cumulative nature.
 
 D. The Conscious-Avoidance Instruction
 
 74
 The trial court instructed the jury that it could find that the government had proven Hoyvald and Lavery had knowledge that the Company's apple juice was adulterated if it found they had deliberately avoided gaining actual knowledge of that fact. Defendants contend that this conscious-avoidance charge was erroneous because (1) it unfairly undercut their advice-of-counsel defense, and (2) it permitted the jury to convict them without finding that they had the requisite intent to commit the offenses. We reject both contentions.
 
 
 75
 1. The Effect on the Advice-of-Counsel Defense
 
 
 76
 Defendants' claim that any conscious-avoidance charge was impermissible because it was inconsistent with a defense of reliance on the advice of counsel is untenable. As described in greater detail below, the Supreme Court has emphasized that an advice-of-counsel defense presupposes the defendant's solicitation of advice in good faith. Williamson v. United States, 207 U.S. 425, 453, 28 S.Ct. 163, 173, 52 L.Ed. 278 (1908). This Court has repeatedly approved use of a conscious-avoidance charge in a variety of cases in which there was a genuine issue as to the defendant's good-faith ignorance of the illegality of his conduct. See, e.g., United States v. Schiff, 801 F.2d 108, 112-13 (2d Cir.1986) (knowledge of tax laws), cert. denied, 480 U.S. 945, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987); United States v. Heinemann, 801 F.2d at 93-94 (knowledge of lawfulness of tax avoidance scheme). There is no logical reason that this instruction may not also be used in the presence of an advice-of-counsel defense, the thrust of which is that the defendant, on the basis of counsel's advice, believed his conduct to be lawful and thus could not be found to have had unlawful intent. Though a defendant who would rely on an advice-of-counsel defense is required to have disclosed all pertinent information in his possession to his attorney, see, e.g., Williamson v. United States, 207 U.S. at 453, 28 S.Ct. at 173; United States v. King, 560 F.2d 122, 132 (2d Cir.), cert. denied, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977), there is no inherent inconsistency between his taking that action and his studious avoidance of gaining other pertinent information. Accordingly, we see no doctrinal problem with the court's giving a conscious-avoidance instruction in this case. Accord United States v. Duncan, 850 F.2d 1104, 1118 (6th Cir.1988) (where defendant asserts good-faith reliance on advice from tax accountant, it is appropriate to "combin[e] the reliance instruction with an instruction on the adverse effect 'willful blindness' must have on a good faith defense to criminal intent").
 
 
 77
 Nor did the instruction as given in the present case unfairly impinge on the advice-of-counsel defense. In Williamson, the Supreme Court approved the following advice-of-counsel instruction as the most favorable to the defendant that may be given "consistently with right," 207 U.S. at 453, 28 S.Ct. at 173:
 
 
 78
 [I]f a man honestly and in good faith seeks advice of a lawyer as to what he may lawfully do ..., and fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of crime [sic ] which involves willful and unlawful intent[,] even if such advice were an inaccurate construction of the law. But, on the other hand, no man can willfully and knowingly violate the law and excuse himself from the consequences thereof by pleading that he followed the advice of counsel.
 
 
 79
 Id.
 
 
 80
 The instruction of the district court in the present case followed this charge nearly in haec verba. Thus, the court stated that the jury must decide
 
 
 81
 whether the defendant you are considering honestly and in good faith sought the advice of a lawyer as to what he could lawfully do in the future; whether he fully and honestly laid all material facts of which he has knowledge before the lawyer; and whether, in good faith, he honestly followed such advice, relying upon it and believing it to be correct.
 
 
 82
 ... It is the law that a defendant cannot be convicted of a crime that involves willful and unlawful intent, even if such advice were an inaccurate construction of the law, if the defendant relies in good faith on that advice.
 
 
 83
 On the other hand, no man can willfully and knowingly violate the law and excuse himself from the consequences of his conduct by pleading that he followed the advice of his lawyer.
 
 
 84
 Accordingly, we reject the contention that the conscious-avoidance charge could not be given on account of the advice-of-counsel defense.
 
 2. The Element of Intent
 
 85
 In order to convict a defendant of conspiracy or mail fraud, the government must prove that he had the specific intent to commit the crime charged. See Direct Sales Co. v. United States, 319 U.S. at 711, 63 S.Ct. at 1269 (conspiracy); United States v. Lanza, 790 F.2d 1015, 1024 (2d Cir.) (conspiracy), cert. denied, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986); United States v. Gelb, 700 F.2d 875, 879 (2d Cir.) (mail fraud), cert. denied, 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983); United States v. Von Barta, 635 F.2d 999, 1005 n. 14 (2d Cir.1980) (mail fraud), cert. denied, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981). Similarly, a defendant is guilty of felony violation of Sec. 331(a) if he has acted with "intent to defraud or mislead." 21 U.S.C. Sec. 333(b). Hoyvald and Lavery contend that the conscious-avoidance charge as delivered by the trial court was erroneous because it allowed the jury to convict them without finding the requisite intent. Although the charge could have been clearer in this respect, we find no reversible error.
 
 
 86
 Conscious avoidance is a concept that deals most directly with knowledge. A conscious-avoidance instruction is appropriate when a defendant claims to lack "some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance." United States v. Lanza, 790 F.2d at 1022. Nonetheless, conscious avoidance is not irrelevant to intent, for knowledge is one component of intent. "Without the knowledge, the intent cannot exist." Direct Sales Co. v. United States, 319 U.S. at 711, 63 S.Ct. at 1269. Thus, even in a conspiracy case, in which specific intent must be proven, use of a conscious-avoidance instruction may be appropriate with respect to the defendant's knowledge of the objectives of the conspiracy, see, e.g., United States v. Gurary, 860 F.2d 521, 527 & n. 6 (2d Cir.1988); United States v. Lanza, 790 F.2d at 1022-23. The same is true of mail fraud cases. See, e.g., United States v. Shareef, 714 F.2d 232, 233 (2d Cir.1983); see also United States v. Brien, 617 F.2d 299, 312 (1st Cir.), cert. denied, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).
 
 
 87
 In contending that the trial court's conscious-avoidance charge prejudiced them with respect to the element of intent, defendants focus on two sentences in the instructions:
 
 
 88
 Thus, even if you find that the defendant you are considering did not have actual knowledge that the apple juice concentrate and apple juice were adulterated, you may still find that the knowledge, and intent and willfull requirements are satisfied if you find that the defendant you are considering consciously avoided knowledge of the authenticity of the apple juice or concentrate,
 
 
 89
 and
 
 
 90
 In determining whether the defendant you are considering acted knowingly, willfully and intentionally, you may consider whether he deliberately closed his eyes to what otherwise would have been obvious to him....
 
 
 91
 It would indeed be preferable for trial courts to refrain from describing conscious avoidance in a way that suggests that it is equally probative of knowledge and intent, for though it is relevant to both it is sufficient only as to knowledge. From the quoted statements it would arguably be possible for a jury, if it focused on them in isolation, to draw the unwarranted inference that it was permitted to find the requisite intent solely from the fact of conscious avoidance of knowledge. Thus, we would urge the trial court in each case to clarify for the jury to the greatest extent possible that the conscious-avoidance concept is pertinent to knowledge or sincerity of belief, or to the knowledge component of intent, but that a finding of conscious avoidance could not alone provide the basis for finding purpose or for finding intent as a whole.
 
 
 92
 Nonetheless, in assessing the likely effect of the quoted statements on the jury in the present case, we must view them in light of the jury charge as a whole, Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973), and we conclude that the charge as a whole properly instructed the jury that conscious avoidance could satisfy only the knowledge element of the offense or the knowledge component of the intent element. For example, with respect to the conspiracy count, the district court stated that a defendant must be found to have "willfully entered" the unlawful agreement, that he "knowingly and willfully became a member," and that he "willfully participated in the unlawful plan with the intent to advance or further" the conspiracy. The court defined "willfully" as acting "voluntarily or intentionally and with a specific intent to do something the law forbids." The court stated that for proof of membership in a conspiracy, specific intent must be proven, and it made it clear that intent comprises both knowledge and purpose, defining specific intent as "knowingly d[oing] an act which the law forbids, purposely intending to violate the law." It then stated that two varieties of knowledge are involved in a conspiracy charge, the first of which--knowing participation--requires specific intent, but the second of which--knowledge of the unlawful objectives--may be satisfied by conscious avoidance. Similar explanations and definitions were given for the mail fraud and FDCA charges.
 
 
 93
 In sum, viewing the charge given here in its entirety, we conclude that the requisite mental state for each element of each crime alleged was correctly described, separately and repeatedly, to the jury, and that the challenged statements did not constitute reversible error.
 
 E. Miscellaneous Contentions
 
 94
 Defendants make a variety of other arguments that we have also found to be without merit. They include claims that the failure to start trial before November 1987 violated the Speedy Trial Act and that the court erred in admitting certain evidence as coconspirator statements.
 
 1. The Speedy Trial Claim
 
 95
 The Speedy Trial Act, 18 U.S.C. Sec. 3161 et seq. (the "Act"), provides that except for days that are "excludable" from the computation required by the Act, a defendant shall be brought to trial within 70 days after indictment or arraignment, whichever occurs later. Id. Secs. 3161(c)(1) and (h). Hoyvald and Lavery contend that the delay between their arraignment in November 1986 and the beginning of trial in November 1987 encompassed 186 nonexcludable days, and thus the indictment against them should be dismissed. For the reasons stated by the district court, see 677 F.Supp. 117 (1987), this argument is meritless.
 
 
 96
 The Speedy Trial Act provides, inter alia, that the district court may grant a continuance on the request of either side or on its own motion, and that the resulting delay may be excluded from the 70-day computation if the court (1) finds "that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial," and (2) sets forth its reasons for that finding on the record. Id. Sec. 3161(h)(8)(A); see also United States v. Tunnessen, 763 F.2d 74, 76-78 (2d Cir.1985) (finding must be made before excludable period begins). Among the factors the court may consider in making such a finding is that
 
 
 97
 the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.
 
 
 98
 Id. Sec. 3161(h)(8)(B)(ii). While these provisions accord the district court considerable discretion to grant a continuance when it is "necessary to allow further preparation" for trial, United States v. Rojas-Contreras, 474 U.S. 231, 236, 106 S.Ct. 555, 558, 88 L.Ed.2d 537 (1985), they do not permit unlimited delays, and the trial court has the responsibility to ensure that the length of an excludable continuance is reasonably related to the needs of the case, see United States v. LoFranco, 818 F.2d 276, 277 (2d Cir.1987) (dictum). All of these standards appear to have been met in the present case.
 
 
 99
 At the arraignments in November 1986, the government informed the court that the case was complex, noting, inter alia, that there were eight defendants and 470 counts, requiring proof of more than 2,500 separate offenses at trial. It pointed out that its proof would include extensive scientific evidence and thousands of documents designed to show that the juice and concentrate were adulterated and were shipped in interstate commerce. The government also stated that counsel for Hoyvald had indicated that he anticipated extensive defense motions, and the court noted that a number of the defendants had requested additional time to make their motions. In response to an inquiry from the court, Hoyvald's attorney stated, "Your Honor, we agree with the Government's representation that it is a complex case and would waive a Speedy Trial Act...." Lavery's counsel joined this representation. The court thereupon accepted the parties' representations and declared the case a "complex case" within the meaning of the Act and stated that it would postpone setting a trial date until pretrial proceedings were well underway.
 
 
 100
 Thereafter, defendants made more than a dozen motions, the last of which were submitted on March 31, 1987. Among these were motions by Hoyvald for additional time to file other pretrial motions, including motions to take depositions and to issue letters rogatory. In connection with the latter motions, Hoyvald's counsel represented, inter alia, that pretrial discovery was needed of present and former employees of Beech-Nut's parent company, headquartered in Switzerland, and that counsel was unable at that time to identify with certainty the persons living outside the United States who might be called as witnesses for Hoyvald at trial. Counsel expected to conduct interviews and to make determinations as to what depositions and letters rogatory would be needed "over the next several months." The last of the motions filed on or before March 31 were decided on May 11, 1987.
 
 
 101
 During this motion period, the government made available to defendants some 30,000 documents in response to their requests for discovery. It subsequently served trial subpoenas duces tecum on Beech-Nut, demanding the production of a number of corporate records. Beech-Nut's initial response was a wholesale refusal to produce on the ground of attorney-client-privilege, though it did not file a motion to quash. During this period, Hoyvald neither made any requests for depositions or letters rogatory nor informed the court that he had decided not to make such requests. Nor did any defendant advise the court that he, she, or it was ready for trial.
 
 
 102
 Giving "substantial advance notice," 677 F.Supp. at 122, the court scheduled a pretrial conference for October 14, 1987. At that conference, for the first time, Hoyvald moved orally for dismissal of the indictment on the ground that the Speedy Trial Act provisions had been violated, apparently attempting to repudiate his earlier agreement that the case was complex. Counsel invoked a statement by the court, made in the process of denying certain of defendants' earlier motions, that the defendants were attempting to complicate unnecessarily an otherwise straightforward case. See 659 F.Supp. at 1490. The court denied Hoyvald's speedy trial motion in an opinion reported at 677 F.Supp. 117, familiarity with which is assumed. We affirm substantially for the reasons stated in the district court's opinion.
 
 
 103
 The defendants had agreed at the outset that the case was complex; they had not advised the court of any change in that view prior to the October 1987 conference. With or without their agreement, the court's conclusion in all the circumstances that the case was complex within the meaning of the Speedy Trial Act was not an abuse of discretion. Further, several matters remained open. Hoyvald had represented to the court in March 1987 that he needed several months just to determine what depositions and letters rogatory he would need; he had not advised the court of any change in his discovery plans. Beech-Nut had refused to produce documents pursuant to the government's trial subpoena, and its compliance remained unresolved at the time the court, on its own motion, scheduled the October 1987 conference.
 
 
 104
 In sum, the pretrial delay here seems to have been reasonably related to the actual needs of the case. Though it would perhaps generally be preferable for the court initially to set a tentative trial date, it is not an abuse of discretion in a case such as this to postpone the setting of a date until the extent of the needed pretrial proceedings becomes clearer, so long as there is no intent or appearance that unlimited or undue delay will be permitted. There is no hint whatever in the present record that the court was willing to tolerate indefinite delay. It had indicated that it would set a trial date when defendants' pretrial discovery needs came into clearer focus, and it scheduled the October 1987 conference on its own motion. In all the circumstances, we find no abuse of discretion and no violation of the Act.
 
 
 105
 2. Admissibility of the Coconspirator Statements
 
 
 106
 At trial, LiCari testified, over defendants' objection, to conversations he had in 1983 with two Beech-Nut employees on the subject of Beech-Nut's sale of adulterated juice. LiCari, who had left Beech-Nut's employ in January 1982, testified that he had met Beech-Nut's purchasing manager Jones at an industry association meeting in January or February of 1983, and that Jones "said that Mr. Lavery had indicated that they got away with it, that the matter was dead." LiCari testified that William Knutsen, manager of quality control in Beech-Nut's Canajoharie plant, made a similar statement to him. The trial court overruled defendants' hearsay objection to this testimony on the ground that Lavery's statements to Jones and Knutsen were admissions of a party and thus not hearsay, see Fed.R.Evid. 801(d)(2)(A), and that the statements of Jones and Knutsen to LiCari were coconspirator statements in furtherance of the conspiracy, and thus not hearsay, see Fed.R.Evid. 801(d)(2)(E). Lavery contends that he is entitled to a new trial because "under no view of the facts could these merely narrative statements, made to a person outside the alleged conspiracy, have been uttered in furtherance of any conspiracy." We disagree.
 
 
 107
 Whether a proffered statement is made "in furtherance" of a conspiracy is a preliminary question of fact to be determined by the trial court by a preponderance of the evidence. See United States v. DeJesus, 806 F.2d 31, 34 (2d Cir.1986). The court's finding that a statement was made in furtherance of a conspiracy is not subject to reversal unless it is clearly erroneous. See United States v. Rahme, 813 F.2d 31, 36 (2d Cir.1987). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 
 108
 The principal question in the "in furtherance" issue is whether the statement promoted, or was intended to promote, the goals of the conspiracy. "[I]dle chatter" does not meet the test, e.g., United States v. Lieberman, 637 F.2d 95, 103 (2d Cir.1980); nor does a " 'merely narrative' " description by one coconspirator or the acts of another, United States v. Heinemann, 801 F.2d at 95 (quoting United States v. Birnbaum, 337 F.2d 490, 495 (2d Cir.1964)). Coconspirator statements may be found to be "in furtherance" of the conspiracy within the meaning of Rule 801(d)(2)(E) if they "prompt the listener to respond in a way that facilitates the carrying out of criminal activity." United States v. Rahme, 813 F.2d at 35. Though the Rule requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, see, e.g., United States v. Lieberman, 637 F.2d at 102, there is no requirement that the person to whom the statement is made also be a member.
 
 
 109
 In the present case, the trial court found that the statements of Jones and Knutsen were in furtherance of the conspiracy because they were designed to "cover up" the matter of Beech-Nut's distribution of adulterated juice. This finding was not clearly erroneous. Although LiCari was not alleged to have been a member of the conspiracy, he was obviously intimately aware of the events from 1978 to 1982 and of Lavery's response, or lack of response, to the reports that the concentrate purchased from Universal was adulterated. He was thus somewhat at risk of being accused of complicity in those events. He also had repeatedly urged Lavery and Jones to terminate the purchases from Universal, and he may well have been perceived by Lavery and other Beech-Nut officials as a risk to them. In the circumstances, it was permissible for the court to infer that members of the conspiracy told LiCari that Lavery believed the matter was finished in an effort to reassure LiCari and encourage him to not to reveal incriminating information. Thus, the finding that the statements were in furtherance of the conspiracy was not clearly erroneous.
 
 CONCLUSION
 
 110
 We affirm Lavery's conviction on the conspiracy and mail fraud counts. We reverse Hoyvald's and Lavery's convictions on the substantive FDCA counts for lack of venue in the Eastern District of New York and remand to the district court for dismissal of those counts of the indictment.
 
 CARDAMONE, Circuit Judge, dissenting in part:
 
 111
 Although I agree that the conspiracy and mail fraud convictions should be affirmed, I respectfully dissent from that portion of the majority opinion reversing the substantive FDCA convictions on the grounds of improper venue. I would hold, as did the district court, that violations of 21 U.S.C. Sec. 331(a) are "continuing offenses," to which the venue provisions of 18 U.S.C. Sec. 3237(a) apply. Because a continuing offense under Sec. 3237(a) is triable "in any district in which such offense was begun," venue was properly laid in the Eastern District of New York where appellants Hoyvald and Lavery began purchasing adulterated and misbranded juice concentrate. In my view therefore appellants' convictions on the FDCA offenses should be affirmed.
 
 
 112
 For purposes of its venue analysis, the majority agrees that violations of Sec. 331(a) are continuing offenses subject to the venue provisions of Sec. 3237. It notes that venue is properly laid "in a district from which defendant caused the unlawful introduction of goods into commerce, even though physical shipment commenced from a different district." See United States v. Taller, 394 F.2d 435, 437-38 (2d Cir.), cert. denied, 393 U.S. 839, 89 S.Ct. 115, 21 L.Ed.2d 109 (1968)). In construing a continuing offense, the Supreme Court counsels that " 'the locality of [the] crime shall extend over the whole area through which force propelled by an offender operates.' " United States v. Cores, 356 U.S. 405, 408, 78 S.Ct. 875, 878, 2 L.Ed.2d 873 (1958) (quoting United States v. Johnson, 323 U.S. 273, 275, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944)).
 
 
 113
 Here, Lavery had reason to question the authenticity of the concentrate Beech-Nut was purchasing as early as October 1978 when he received Dr. LiCari's initial memorandum. Nevertheless, he continued to authorize purchases of such concentrate from Universal's Long Island warehouse, and did so despite reports that the Universal facilities did not include blending equipment needed to manufacture the pure apple concentrate that Beech-Nut was allegedly buying. Even after having received several adverse reports concerning the quality of Beech-Nut juices in early 1981--including the unsolicited report of the Swiss laboratory--Hoyvald and Lavery continued buying the ersatz concentrate from their bargain-basement suppliers in the Eastern District. Upon receipt of the concentrate at its upstate plant, Beech-Nut merely added water and Vitamin C and marketed a product it labeled as containing "100% Fruit Juice, Apple Juice from Concentrates and Vitamin C." Thus, appellants' FDCA offenses began with the purchase of concentrate from the district in which those offenses were tried. It seems plain that "forces propelled by the defendants" in the commission of the crimes that are the subject of this appeal did "operate" in the Eastern District of New York.
 
 
 114
 The analytical framework that is set forth in United States v. Reed, 773 F.2d 477 (2d Cir.1985), supports the conclusion that the Eastern District was the appropriate venue for appellants' trial. In Reed, we noted that the Constitution requires "that the venue chosen be determined from the nature of the crime charged as well as from the location of the act or acts constituting it, and that it not be contrary to an explicit policy underlying venue law." Id. at 480. Because the Supreme Court has not enumerated the precise policies underlying venue law, we concluded that "fairness to defendants [could not] be the sole grounds for determining venue" and held that the test considers "a number of factors--the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding...." Id. at 481.
 
 
 115
 The majority first considers the situs of the defendants' criminal acts and concludes that appellants conducted no business from the Eastern District of New York. Concededly, Hoyvald and Lavery did not personally go into the Eastern District to buy the concentrate. But I do not read Sec. 3237 as requiring the physical presence of defendants in the district where the continuing offense was begun. Nothing in the statute or the Constitution mandates that, for venue to be in the Eastern District, the introduction of adulterated juice into interstate commerce must have been caused by these appellants from the Eastern District. It is sufficient that every shipment of juice recited in counts 22 through 450 of the indictment resulted from the appellants' knowing purchase of simulated apple juice concentrate that was warehoused in the Eastern District. At the direction of Lavery, and later Hoyvald, Beech-Nut employees regularly placed calls to their suppliers in the Eastern District and routinely followed-up by mailing written confirmation orders into that district. The focus of the effect of this continuing crime was nationwide, and suitability for factfinding was equally as good in the Eastern District as in the Northern District of New York.
 
 
 116
 Further, prior precedents support venue in the Eastern district. In United States v. Cattle King Packing Co., 793 F.2d 232 (10th Cir.), cert. denied, 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986), Colorado venue was held appropriate for the trial of various Federal Meat Inspection Act violations, 21 U.S.C. Sec. 601-624 (1982), despite the fact that the record was devoid of any evidence (1) that the adulterated meat--shipped from Nebraska to California--had ever passed through the forum district, and (2) that the defendant who contested the Colorado venue had ever set foot in the district where the offenses were tried. Venue in Colorado was upheld based upon evidence that one of the defendant's subordinates had made a number of telephone calls from Colorado at the direction of his superior in his efforts to sell the adulterated meat to a California wholesaler. Id. at 239 n. 4.
 
 
 117
 Cattle King illustrates the modern trend of moving from formalism toward a flexible interpretation of continuing offenses under Sec. 3237. Thus, for example, in U.S. v. Ramirez-Amaya, 812 F.2d 813, 816 (2d Cir.1987), we upheld venue under Sec. 3237(a) in the Southern District of New York with respect to charges of importation of cocaine where (1) the "importation" had occurred in Florida, and where (2) the only connection between the importation and the forum district was the fact that an FBI-owned plane which transported the substances from Florida to LaGuardia Airport in the Eastern District of New York flew over a body of water in the joint jurisdiction of the Eastern and Southern Districts.
 
 
 118
 Perhaps most significant is United States v. Busic, 549 F.2d 252 (2d Cir.1977). There a passenger plane was hijacked in airspace outside the district where the crime was charged. The crime of aircraft piracy, 49 U.S.C. App.Sec. 1472 (1982), has its own venue provision that employs language virtually identical to that in Sec. 3237: It provides that the offense may be tried in any district in which the offense was "begun, continued, or completed." Id. Sec. 1473(a). Defendants had conspired and prepared to commit the offense in the Eastern District of New York by assembling the constituent parts for their imitation bombs and by boarding the plane at LaGuardia Airport. Yet the district court held that venue on the substantive highjacking counts (as opposed to the conspiracy counts) was not proper in the Eastern District because the highjackers had not exercised actual control over the aircraft until well after it had left the district. The district judge reasoned, as does the majority in this case, that the offense of air piracy had not yet begun while the defendants were in the Eastern District because the acts which defendants had carried out in that district were merely preparatory to the substantive crimes.
 
 
 119
 In reversing, we rejected such a "tortured and hyperconstricted reading" of the term "begun," and held that the crime of air piracy began in the Eastern District, even though the actual highjack note was not passed to the crew of the aircraft until well after the plane had left the district. Id. at 256. We expressly declined to adopt defendants' contention that the venue statute is "susceptible to one narrow constitutional reading, which would advance the moment of beginning so near the point of consummation of the crime that the words might as well be read as synonymous and without any significant statutory difference." Id. In enacting Sec. 3237 Congress did not design a theoretical statute that would operate in "an abstract world of Platonic forms, but to the real world of action." Id. at 258.
 
 
 120
 In the instant case, the crime of introducing adulterated and misbranded juice into interstate commerce began with the knowing purchase of adulterated concentrate from suppliers in the Eastern District of New York. Such purchases were no more preparatory acts than were the manufacture of the imitation dynamite and the boarding of the plane in Busic. The act of purchasing the adulterated concentrate was the point at which the offense was begun. The purchase was not preparation for, but initiation of the substantive FDCA offenses for which appellants were convicted.
 
 
 121
 Finally, the majority cites United States v. Bozza, 365 F.2d 206, 220-21 (2d Cir.1966), as standing for the proposition that the making of a contract to receive stolen goods is not the beginning of a receiving, and that appellants' purchase of concentrate cannot therefore constitute the beginning of the conduct proscribed by Sec. 331(a). But Bozza is inapposite to the present case because there the crimes were noncontinuing, and the venue provisions of Sec. 3237 were held inapplicable. Because the crimes in Bozza were single-act offenses, we could not use the liberalized venue provision applicable in the instant case. The remaining cases cited by the majority are also inapposite because most do not involve continuing offenses. See, e.g., United States v. Davis, 666 F.2d 195, 200 (5th Cir. Unit B 1982) (venue provisions of Sec. 3237 not mentioned); United States v. Chestnut, 533 F.2d 40, 47 (2d Cir.1976) (trial of a non-continuing, single-act offense).
 
 
 122
 Accordingly, I dissent from that portion of the majority opinion that reverses the FDCA convictions on the grounds of improper venue and vote to affirm those convictions.