23-6333
USA v. NG CHONG HWA

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2024

(Argued:  October 31, 2024                    Decided:  December 5, 2025)

Docket No. 23-6333

_____

UNITED STATES OF AMERICA,

*Appellee*,

- v. -

NG CHONG HWA, also known as Roger Ng,

*Defendant-Appellant*.[*]
_____

Before:  KEARSE, SULLIVAN, and ROBINSON, *Circuit Judges*.

Appeal from a judgment entered in the United States District Court for

the Eastern District of New York following a jury trial before Margo K. Brodie, *Chief*

---

[*] The Clerk of Court is instructed to amend the official caption to conform with the above.

*Judge*, convicting defendant of conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA") in violation of 18 U.S.C. § 371, *see* 15 U.S.C. §§ 78dd-1, 78dd-3, and 78ff(a); conspiracy to violate FCPA internal-accounting-controls provisions in violation of 18 U.S.C. § 371, *see* 15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), and 78ff(a); and conspiracy to commit international money laundering in violation of 18 U.S.C. § 1956(h), *see id*. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(c)(7)(B)(iv), and 1957(a); and sentencing him principally to 120 months' imprisonment, to be followed by a two-year term of supervised release, and ordering him to forfeit $35.1 million.  On appeal, defendant contends principally that the district court erred in excluding from evidence a recording that was material to his defense; that the government breached an agreement pursuant to which he had waived extradition from Malaysia; that venue in the Eastern District of New York was improper; and that the forfeiture order constituted an excessive fine, in violation of the Eighth Amendment to the Constitution.  Finding no basis for reversal, we affirm the judgment.

        Affirmed.

        ALIXANDRA E. SMITH, Assistant United States Attorney, Brooklyn, New York (Nicole M. Argentieri, Acting Assistant Attorney General, Criminal Division, Brent

-2-

Wible, Samantha Bateman, Trial Attorneys, Criminal Division, United States Department of Justice, Washington, D.C., Breon Peace, United States Attorney for the Eastern District of New York, Amy Busa, Anthony Bagnuola, Drew G. Rolle, Dylan A. Stern, Assistant United States Attorneys, Brooklyn, New York, on the brief), *for Appellee*.

ALEXANDRA A.E. SHAPIRO, New York, New York (Theodore Sampsell-Jones, Avery D. Medjuck, Shapiro Arato Bach, New York, New York, on the brief), *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Ng Chong Hwa, also known as Roger Ng (or "Ng"), appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York following a jury trial before Margo K. Brodie, *Chief Judge*, convicting him of conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA") in violation of 18 U.S.C. § 371 ("Count One"), *see* 15 U.S.C. §§ 78dd-1, 78dd-3, and 78ff(a); conspiracy to violate FCPA internal-accounting-controls provisions in violation of 18 U.S.C. § 371 ("Count Two"), *see* 15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), and 78ff(a); and conspiracy to commit international money laundering in violation of 18 U.S.C. § 1956(h) ("Count Three"),

-3-

*see id*. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(c)(7)(B)(iv), and 1957(a). Ng was sentenced principally to 120 months' imprisonment, to be followed by a two-year term of supervised release, and was ordered to forfeit $35.1 million. On appeal, he contends principally that the district court erred in excluding from evidence a recording that was material to his defense; that the government breached an agreement pursuant to which he had waived extradition from Malaysia; that venue in the Eastern District of New York was improper; and that the forfeiture order constituted an excessive fine, violating the Eighth Amendment to the Constitution. For the reasons that follow, we find no basis for reversal.

## I. BACKGROUND

The FCPA, 15 U.S.C. § 78dd-1 *et seq.*, was enacted to promote ethical business practices in foreign commerce and to deter corrupt practices such as bribery and kickbacks. It prohibits issuers of registered securities, and any officer, director, employee, or agent of such an issuer, from, *inter alia*, making payments of money, or offering or promising to pay money or give anything of value to

> any foreign official for purposes of--

-4-

(A)(i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or . . .

(B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such issuer in obtaining or retaining business for or with, or directing business to, any person.

15 U.S.C. §§ 78dd-1(a)(1)(A)(i) and (a)(1)(B). The FCPA also requires, *inter alia*, that such an issuer of securities devise and maintain a system of directives, records, and internal accounting controls sufficient to provide reasonable assurance that "access to assets is permitted only in accordance with management's general or specific authorization"; and it prohibits any person from "knowingly circumvent[ing]" the mandated internal accounting controls. 15 U.S.C. §§ 78m(b)(2)(B)(iii) and 78m(b)(5).

Title 18's money laundering provisions include a prohibition against

transport[ing], transmit[ting], or transfer[ring], or attempt[ing] to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

(A) with the intent to promote the carrying on of specified unlawful activity.

-5-

18 U.S.C. § 1956(a)(2)(A). The "term 'specified unlawful activity'" is defined to include

> (B) with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving--
>
> . . . .
>
> (iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official.

18 U.S.C. § 1956(c)(7)(B)(iv); *see also id*. §§ 1957(a) and (f)(2) (prohibiting knowing engagement in "monetary transaction[s]" in "property constituting, or derived from, proceeds obtained from a criminal offense"). Section 1956(h) prohibits conspiring to commit any offense defined in § 1956 or § 1957.

Ng was convicted on the three conspiracy counts described above as charged in a second superseding indictment, those three counts--two with regard to FCPA violations and one with regard to money laundering--being the same three counts charged in both the original and the first superseding indictment (*see* Part II.B. below).

A. *The Government's Case*

The government's evidence at trial, which included testimony from 27 witnesses and more than 2,000 exhibits ("GX"), and the sufficiency of which is not challenged on appeal, showed the following. Goldman Sachs Group, Inc. ("Goldman"), is a global investment banking, securities, and investment management firm headquartered in New York, New York. As also an issuer of securities registered on a United States stock exchange, required to file reports with the United States Securities and Exchange Commission, Goldman was required to maintain the FCPA-mandated internal accounting controls. To meet the latter requirement, Goldman had a compliance department that, *inter alia*, collaborated with its legal department and conducted due diligence on potential transactions, to ensure conformity with regulatory requirements and company policies.

Ng is a Malaysian national who, from approximately 2005 to May 2014, was employed by various Goldman subsidiaries. During the period 2012-2014, he was a Managing Director and was the head of Goldman's operations in Malaysia. Ng worked closely with Timothy Leissner, who was then Goldman's Southeast Asia Chairman and was a Participating Managing Director, *i.e.*, a Goldman partner. Leissner became the government's principal witness at trial.

1Malaysia Development Berhad ("1MDB") was an entity owned by the Malaysian government, overseen by senior Malaysian government officials, and performing government functions on behalf of Malaysia; it was an instrumentality of a foreign government within the meaning of the FCPA. 1MDB had been created by the Malaysian government in 2009 for the purpose of pursuing investment and development projects for the economic benefit of Malaysia and its people. To raise money to fund those projects, 1MDB planned to rely primarily on issuing debt; but it could not raise substantial amounts of money on its own. The first two 1MDB bond offerings at issue in this prosecution were facilitated by International Petroleum Investment Company ("IPIC"), an Abu Dhabi-owned investment fund. IPIC directly or indirectly guaranteed 1MDB's payment of its obligations on the bonds issued in those two offerings. 1MDB engaged Goldman as its advisor and underwriter to conduct the offerings.

Low Taek Jho, also known as Jho Low ("Low" or "Jho"), was a young Malaysian financier who had connections with government officials in Malaysia and Abu Dhabi. He had close personal relationships with Malaysia's Prime Minister Najib Razak and with IPIC's chief executive officer Sheikh Mansour, who was also deputy prime minister of Abu Dhabi and brother of the Crown Prince. Low was never

employed by the government of Malaysia or Abu Dhabi, and he did not hold a formal position at 1MDB; but he was "key" in arranging IPIC's guarantees of 1MDB's initial bond offerings. (Trial Transcript ("Tr.") at 414.)

Ng had first met Low in 2008 and was encouraged by Goldman to cultivate a relationship with him as a promising business source. Ng introduced Low to Leissner in 2009. Thereafter, a Goldman client that owned energy assets it wished to sell suggested that Leissner find a buyer that Goldman could represent for the purchase of the property. Ng inquired of Low as to 1MDB's interest in those assets, and 1MDB's first bond offering, called "Project Magnolia," was soon launched. Additional 1MDB bond offerings, called "Project Maximus" and "Project Catalyze," quickly followed; and in a "very short" span of 16 months, the three offerings raised a total of $6.5 billion. (Tr.391.)

Leissner described Low as the "[un]official" "decision-maker" (*id*. at 412, 414) as to, *inter alia*, 1MDB's "fund-raising, . . . including linking into the Middle East to provide the guarantee for the credit of 1MDB that was . . . crucial to the transactions" (*id*. at 414). Low would also "ensure that all 1MDB actions and authorizations and approvals were obtained." (*Id*.) He, Ng, and Leissner (collectively the "coconspirators") met, and Low drew a diagram of individuals in Malaysia and

-9-

Abu Dhabi who would need to be "taken care of" in order to obtain the necessary approvals for the projects. (*Id*. at 447.) Leissner testified that "Jho was the key person designing the scheme, which included deciding how much money would be used to pay bribes and kickbacks, who would get that money, and [at] what time, and how much would go to himself." (*Id*. at 415.) Low "received a large amount of what was siphoned off of 1MDB." (*Id*.)

Project Magnolia, which was intended to fund 1MDB's purchase of energy company assets, raised $1.75 billion. It closed on May 21, 2012, and Goldman transmitted $907.5 million to 1MDB. The next day, approximately $577 million were transferred by 1MDB to a shell corporation controlled by Low. Of that $577 million, approximately $295 million were promptly transferred to another shell corporation, with an additional $133 million being sent to that second shell company two months later. That company then sent a total of just under $52 million to Capital Place Holdings ("Capital Place") in Hong Kong, a Leissner-controlled shell company in the name of his then-wife (Tr.982-84) Judy Chan. Capital Place then sent a total of $24.4 million to a company owned by Ng's mother-in-law and managed by his wife. (*See id*. at 4684-85; GX-151.)

Project Maximus, the next 1MDB bond offering, which raised another

$1.75 billion and was intended to fund 1MDB's purchase of a second energy company, closed on October 17, 2012. On October 19, Goldman transmitted $1.64 billion to 1MDB, some $790 million of which 1MDB immediately sent to a shell corporation controlled by Low. Ng, knowing that his kickback from Project Magnolia had been sent from Capital Place, gave Leissner "payment instructions . . . for his share of the Project Maximus kickbacks." (Tr.1115.) Ng directed that his payment again be sent to the shell company owned by his mother-in-law and managed by his wife. (*Id*. at 1115, 4684-87.) That account eventually received $4.2 million from Project Maximus.

In November 2012, 1MDB initiated Project Catalyze, which was intended to fund 1MDB's purchase of an interest in a foreign investment firm and resulted in a bond offering of approximately $3 billion. It closed on March 19, 2013, and Goldman transmitted $2.72 billion to 1MDB. Within days, 1MDB transferred some $1.2 billion to a shell corporation controlled by Low. At the outset of Project Catalyze, Low had made clear that Ng should not expect another kickback, as there was an imminent election in Malaysia and "all monies coming from Project Catalyze needed to be utilized for that election." (*Id*. at 1049.) Nonetheless, after Project Catalyze closed, Ng's mother-in-law's account eventually received $6.5 million. (*Id*. at 1115.)

Ultimately, from the proceeds of the three 1MDB bond transactions, bribes were paid to a dozen government officials in Malaysia and Abu Dhabi, and kickbacks were paid to numerous other "individuals who [we]re not part of Government, or Government-linked entities, yet who worked on the scheme." (*Id*. at 381-82, 446-50; *see* GXs-151, 152, 153, 157, 159.) The coconspirators "hid those flows of payments through a number of offshore shell companies established around the world that allowed the funds to be disguised" so that "there was no suspicion raised when these funds flowed through the banking system around the world." (Tr.384.) Ng, Leissner, and Low, as indicated above, also had shell companies to receive their own kickbacks, opened in names other than their own to conceal their ownership and to mask the source of incoming money.

In sum, of the approximately $5.267 billion that 1MDB received from Goldman in the three bond offerings (net after Goldman's investment banking and advisory fees), over $2.5 billion--*i.e.*, more than 45 percent of what 1MDB received-- were diverted for bribes and kickbacks, including kickbacks to Low, Leissner, and Ng. Ng, for the account in the name of his mother-in-law, received a total of $35.1 million.

Ng did not reveal anything to Goldman's compliance group about the

bribes and kickbacks related to these 1MDB bond offerings. Nor did he reveal that Low was involved. Ng and Leissner had several times proposed that Goldman accept Low as a private wealth client whose money Goldman would manage in its asset management division; but Goldman had always refused, in part because of the 29-year-old Low's flamboyant lifestyle, and in part because the compliance division was uncomfortable at being unable to track the source of Low's wealth. (*Id*. at 420-23, 729.) These were issues about which Leissner "didn't care"; he "wanted to get business for Goldman." (*Id*. at 423.) Thus, he and Ng had concealed Low's role in facilitating 1MDB's bond offerings, because they believed that if the compliance group knew of Low's involvement, it would block Goldman's "enormous opportunity" (*id*. at 636) to participate in the 1MDB bond transactions.

B. *Ng's Defense*

Ng's wife Hwee Bin Lim testified in his defense. She testified that the $35.1 million in payments to the account in her mother's name were returns on an investment her family had made in 2005 with Leissner's wife Judy Chan. The court

denied Ng's motion *in limine* to introduce a videotape of an October 2018 conversation between Hwee Bin Lim and Leissner in which Lim made mention of such an investment (*see* Part II.C. below).

C. *The Verdict and the Sentence*

The jury found Ng guilty on all three counts. The court sentenced him principally to 60 months' imprisonment on each FCPA count, to be served concurrently with each other, and to 60 months' imprisonment on the money laundering count, to be served consecutively. The court ordered Ng to forfeit $35.1 million (*see* Part II.D. below).

## II. DISCUSSION

On appeal, Ng contends principally that the district court erred in denying his motion to introduce the video recording of Lim's October 2018 conversation with Leissner. He also contends that the government, by filing superseding indictments, breached the agreement pursuant to which he had waived extradition from Malaysia; that venue in the Eastern District of New York was

improper; and that the forfeiture order constituted an excessive fine, in violation of the Eighth Amendment to the Constitution. For the reasons that follow, we find none of his contentions persuasive. We begin with the contentions that, if successful, could moot the claims of evidentiary and sentencing errors.

A. *Venue*

In June 2018, Leissner was arrested in the United States on charges of FCPA violations and money laundering in connection with the 1MDB bond transactions described above. He promptly agreed to cooperate with the government's ongoing investigation. The present prosecution was commenced on October 3, 2018, with the filing of an indictment charging Ng and Low with two counts of conspiring with others (Leissner was referred to only as "Co-Conspirator #1") to violate the anti-bribery and compliance provisions of the FCPA, in violation of 18 U.S.C. § 371, and one count of conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h) (the "October 3, 2018 indictment" or "original indictment"). On October 30, 2018, Ng was arrested in Malaysia on a provisional arrest warrant based on the October 3, 2018 indictment and was eventually handed over to the United States (*see* Part II.B. below) in May 2019.

In October 2020, Ng moved for, *inter alia*, dismissal of the original indictment on the ground of lack of venue, arguing that it failed to allege either that he acted in furtherance of a crime charged to have occurred in the Eastern District of New York ("Eastern District" or "EDNY") or that he reasonably foresaw any act in furtherance of a crime in the Eastern District based on his electronic communications, and that he lacked substantial contacts with the Eastern District. The government filed opposing papers; however, before the motion could be addressed by the court, the EDNY grand jury on December 9, 2020, returned a superseding indictment (the "First Superseding Indictment" or "S-1"). The parties' respective arguments with regard to the venue allegations in S-1 were similar to their contentions with respect to those addressing the original indictment, and all were considered by the court.

The basic principles governing venue in federal prosecutions are well established.

> A defendant in a criminal case has the right to be tried in the "district wherein the crime shall have been committed." U.S. Const. amend. VI; *see* Fed. R. Crim. P. 18. . . . "[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the [C]onstitution does not command a single exclusive venue." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985). Rather, venue is proper "in any district in which such [an] offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *see, e.g.*, . . . *United States v. Beech-Nut Nutrition*

-16-

*Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989) ("*Beech-Nut*").  However, venue must be proper with respect to each count.  *See, e.g., United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) ("*Tzolov*"); *Beech-Nut*, 871 F.2d at 1188.

*United States v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021) ("*Chow*").  As to a charge of conspiracy, venue is proper in the district in which the conspiratorial agreement was formed or in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators.  *See, e.g., Tzolov*, 642 F.3d at 318-19; *United States v. Rosa*, 17 F.3d 1531, 1541-42 (2d Cir.), *cert. denied*, 513 U.S. 879 (1994); *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987).

> The government has the burden of proving proper venue; but as venue is not an element of the crime, such proof need only be by a preponderance of the evidence.  *See, e.g., Tzolov*, 642 F.3d at 318; *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008), *cert. denied*, 558 U.S. 935 . . . (2009); *Beech-Nut*, 871 F.2d at 1188 . . . .

*Chow*, 993 F.3d at 143.

In a Memorandum and Order dated September 3, 2021, *see United States v. Ng Chong Hwa*, No. 18-CR-538, 2021 WL 11723583 (E.D.N.Y. Sept. 3, 2021) ("*Ng I*"), the district court denied Ng's motion to dismiss for lack of venue.  It rejected his contention that venue is not proper in a district in which a defendant merely sent or transmitted relevant items or information through it, noting that in conspiracy cases

-17-

"courts in this Circuit have routinely found that 'passing through' a district is sufficient to confer venue." *Id.* at *21 (citing, *e.g.*, *United States v. Kirk Tang Yuk*, 885 F.3d 57, 71-72 (2d Cir.) ("*Kirk Tang Yuk*") (evidence that a coconspirator, who later cooperated with the government, had, in order to sell drugs to an associate, "dr[i]ve[n] over the Verrazano-Narrows Bridge from Staten Island to Brooklyn, passing over the channel known as 'the Narrows'" which "lies within the joint jurisdiction of the Southern and Eastern Districts of New York," was sufficient to establish venue in the Southern District of New York), *cert. denied*, 586 U.S. 920 (2018); *Tzolov*, 642 F.3d at 320 (travel through the Eastern District of New York and the use of JFK airport in the Eastern District "to attend meetings with the investors were overt acts in furtherance of the conspiracies" and sufficed to establish venue in that district for charges of conspiracy)).

The district court ruled that here, "[t]he [First] Superseding Indictment sufficiently allege[d] that Ng and his co-conspirators committed overt acts in furtherance of the conspiracies in the Eastern District." *Ng I*, 2021 WL 11723583, at *23 (internal quotation marks omitted) (citing First Superseding Indictment ¶¶ 37, 42, 45, 63). *See*, *e.g.*, S-1 ¶¶ 63(b), (e), and (f) ("On or about January 27, 2009, NG and Co-Conspirator #1 discussed via email whether to disclose to the Intelligence Group

-18-

at Goldman LOW's involvement in the [Project Magnolia] transaction . . . and decided not to make such disclosure"; thereafter, "Co-Conspirator #1 falsely stated in a committee meeting at Goldman that LOW was not involved in Project Magnolia other than to set up one meeting with an Abu Dhabi official," and in a later "committee meeting at Goldman" "Co-Conspirator #1 falsely stated . . . that LOW was not involved in Project Maximus"; both meetings were "attended by committee members and others located in New York, New York[,] using Goldman's telecommunication facilities, which transited through the Eastern District of New York."). As discussed above, venue is proper in any district in which an overt act in furtherance of the conspiracy has been committed by any of the coconspirators.

The district court also rejected Ng's contention that the allegations in the First Superseding Indictment provided no basis for a finding that the possibility of venue in the Eastern District had been foreseeable to him. The indictment alleged, *inter alia*, that Ng had been a Goldman employee for many years and had had many meetings with other employees who operated in New York; and the court observed that "venue will lie if a reasonable jury could find that it was 'more probable than not' that the defendant 'reasonably could have foreseen' that part of the offense would take place in the district of prosecution." *Ng I*, 2021 WL 11723583, at *22 (quoting *Kirk*

-19-

*Tang Yuk*, 885 F.3d at 69-70 (other internal quotation marks omitted)). The district court also noted that a pretrial motion to dismiss for lack of venue is addressed to the sufficiency of the indictment and does not call for the anticipatory assessment of the trial evidence. It pointed out that "[i]f . . . the Government cannot prove venue at trial, Ng can move for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure based on lack of venue." *Ng I*, 2021 WL 11723583, at *21.

On December 20, 2021, the EDNY grand jury returned a second superseding indictment (the "Second Superseding Indictment" or "S-2"). S-2, which alleged that Ng had committed the same offenses that were charged in S-1 and the original indictment (*see* Part II.B. below), and added allegations with respect to those offenses' location. Repeating an allegation made in both of the first two indictments, S-2 alleged that:

> On or about October 10, 2012, Co-Conspirator #1 falsely stated in a committee meeting at Goldman that LOW was not involved in Project Maximus. The meeting was attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.

(Second Superseding Indictment ¶ 65(j); First Superseding Indictment ¶ 63(f); *see* original indictment ¶ 63(f) (differing from the above quote by having referred to

-20-

Goldman only as "U.S. Financial Institution #1").) In addition, S-2 alleged that:

> (e) On or about March 26, 2012, LOW, Co-Conspirator #1 and others flew on a private jet from Los Angeles, California to Teterboro Airport in Bergen County, New Jersey.

> (f) On or about March 26, 2012, LOW, Co-Conspirator #1 and others traveled from Teterboro Airport in Bergen County, New Jersey, to New York, New York, transiting through the Eastern District of New York, to attend a meeting in New York, New York to discuss, among other things, Project Magnolia.

(Second Superseding Indictment ¶¶ 62(e) and (f).)

Ng did not move prior to trial to dismiss the Second Superseding Indictment for lack of venue. Nor, either at or after trial (in his motions for acquittal or for dismissal of the indictment pursuant to Fed. R. Crim. P. 29) did Ng include any contention that the government had not presented sufficient proof of venue in the Eastern District of New York.

On this appeal, Ng's only challenge to venue is his contention that the district court erred in denying his lack-of-venue motion addressed to the First Superseding Indictment. It is difficult to fathom why this challenge presents a live issue, first because Ng was tried and convicted under the Second Superseding Indictment, not under S-1. *See* Judgment dated March 9, 2023, at 1 (citing "S-2"). While S-1 was not dismissed until later, a valid conviction under S-2--which charged

-21-

Ng with the same offenses as S-1--means that Ng cannot be further prosecuted under S-1 given principles against double jeopardy, *see* U.S. Const. amend. V. Second, as quoted above, ¶¶ 62(e), 62(f), and 65(j) of the Second Superseding Indictment added factually descriptive allegations in Counts One and Two as to coconspirator Leissner's travel and communications through the Eastern District. Ng made no motion to dismiss the Second Superseding Indictment, thus failing to preserve any objection to S-2's venue allegations for appellate review. Third, Ng made no challenge to venue in his Rule 29 motion for acquittal, and we have often said that "objections to venue a[re] waived unless specifically articulated in defense counsel's motion for acquittal," *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007) (internal quotation marks omitted), *cert. denied*, 552 U.S. 1260 (2008); *see, e.g.*, *United States v. Grammatikos*, 633 F.2d 1013, 1022 (2d Cir. 1980); *United States v. Bala*, 236 F.3d 87, 95 (2d Cir. 2000)-- although we nonetheless often proceed to reject the belated venue argument on its merits, *see, e.g.*, *United States v. Potamitis*, 739 F.2d 784, 791-92 (2d Cir.), *cert. denied*, 469 U.S. 918 (1984); *Grammatikos*, 633 F.2d at 1023.

In the present case, for the reasons stated, Ng's contention that venue was insufficiently alleged in the First Superseding Indictment cannot warrant reversal of the judgment of conviction entered under the Second Superseding Indictment.

-22-

B. *Extradition, Waiver, and the Doctrine of Specialty*

After Ng's arrest in Malaysia on October 30, 2018, the United States Department of Justice ("DOJ") in December 2018 requested his extradition to the United States to stand trial on the charges in the October 3, 2018 indictment. Ng was brought to the United States in May 2019 following a waiver of extradition, after negotiations that focused chiefly on the doctrine of specialty.

The doctrine of specialty is an international law principle that prohibits the prosecution of a defendant "for a crime other than the crime for which he [was] extradited," *United States v. Alvarez-Machain*, 504 U.S. 655, 659 (1992). The doctrine "is designed to protect the extraditing government against abuse of its discretionary act of extradition." *United States v. Paroutian*, 299 F.2d 486, 490 (2d Cir. 1962). And while the country that extradites a person has the right to enforce such limitations, the "defendant has no standing to raise the violation of international law" unless there has been a "protest or objection by the offended sovereign." *United States v. Barinas*, 865 F.3d 99, 105 (2d Cir. 2017) (internal quotation marks omitted), *cert. denied*, 586 U.S. 826 (2018); *see, e.g., United States v. Garavito-Garcia*, 827 F.3d 242, 246 (2d Cir. 2016).

The negotiations between the United States and Ng ended with a DOJ letter to Ng's attorneys dated February 12, 2019 ("February 2019 Letter" or "Letter"),

-23-

which stated in pertinent part as follows:

> The U.S. Attorney's Office for the Eastern District of New York and the Money Laundering and Asset Recovery Section and Fraud Section of the U.S. Department of Justice's Criminal Division ("the Offices") write to confirm our understanding regarding your client Ng Chong Hwa, also known as "Roger Ng," with regard to his potential waiver of extradition to the United States in connection with [his] above-referenced criminal case.

> To the extent your client knowingly and willfully waives extradition[1] to the United States no later than February 15, 20l9 ("the Deadline"), the Offices agree that your client will not be detained, tried or punished at the request of our Offices except for (1) the offenses charged in the indictment returned on October 3, 2018 in the above-referenced case, or any lesser included offense proved by the facts on which this indictment was grounded, and (2) any offense committed after the waiver of extradition and initial appearance in the Eastern District of New York. . . .

> [FN]1. This agreement pertains only to your client's waiver of extradition and not to any consent to extradition.

> . . . .

> This letter memorializes the entirety of the agreement between the Offices and your client. No promises, agreements, or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties.

(February 2019 Letter, at 1-2.)

After the grand jury in the Eastern District returned the First

Superseding Indictment in December 2020, Ng contended that it should be dismissed because it was prohibited by the February 2019 Letter. He argued that "[b]y agreeing to not change the offense, the Government agreed to not add or change facts that impact on how it intends to prove that [he] violated a particular law." (Defendant's Reply Memorandum of Law in Support of Motion To Dismiss the Indictment, D.Ct. Dkt. No. 58, at 8.) The government opposed, arguing that the Letter did not become an agreement (a) because it had not been signed, and (b) because Ng had consented to, rather than waived, extradition. The government based the latter argument on the facts that the Malaysian Judge's order to relocate Ng in anticipation of his transfer to United States custody referred to him not as waiving extradition but rather as "consent[ing] to the waiver of the committal proceedings," and that both that Judge's order and the subsequent order by the Malaysian Minister of Home Affairs that Ng be delivered into United States custody cited provisions of Malaysia's "Extradition Act." (*See* Exhibits E and F to Government's Memorandum in Further Opposition to Defendant's Motion to Dismiss, D.Ct. Dkt. No. 59.)

The district court agreed with Ng that he had in fact waived extradition, and that the February 2019 Letter thus controlled the parties' dispute; but it concluded that the First Superseding Indictment did not breach the agreement set out in the

-25-

Letter. The court found that although S-1 added several factual allegations, it was "substantially the same as the original Indictment and the statutory charges remain the same." *Ng I*, 2021 WL 11723583, at *17.

Further, comparing the restrictions stated in the Letter with the restrictions stated in the Malaysia-United States extradition treaty, the court found that the two sets of restrictions were not materially different. *See id*. at *16-*17. Thus, the court concluded that "the Superseding Indictment violate[d] neither the rule of specialty nor the provision in the February 2019 Letter, which mirrors the language in the Extradition Treaty," *id*. at *17.

On appeal, both sides pursue the arguments they made in the district court. In addition, the government contends that any breach-of-contract or breach-of-specialty contention by Ng is subject only to plain-error review because, although Ng moved to dismiss the First Superseding Indictment, he never moved to dismiss the Second Superseding Indictment.

"For there to be 'plain error,' there must be (1) an error that (2) is 'plain' and (3) 'affect[s] substantial rights'; [and] if these elements are satisfied, then the court may correct the error, but only if (4) the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Miller*, 263 F.3d 1, 4 (2d.

Cir 2001) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).  Here, whether on plain-error review or ordinary review, we find no basis for reversal because there was no error in the district court's findings (a) that Ng had complied with the Letter's requirement that he waive extradition, and (b) that S-1 did not breach the Letter's requirement that the government not prosecute Ng for offenses beyond those alleged in the original indictment.  While we also see no error in the district court's conclusion as to the absence of any material difference between the relevant language of the February 2019 Letter and the specialty-related language of the Malaysia-United States extradition treaty, we note that, given the absence of any protest or objection by the government of Malaysia to these superseding indictments of Ng, Ng lacks standing to complain that the superseding indictments violated the treaty.

We see no error in the district court's decision that S-1 did not violate the February 2019 Letter.  A federal indictment is not meant to plead all the evidence the government might wish to present at trial; the Federal Rules of Criminal Procedure state that the indictment is to be "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c); *see also id*. Rule 7(f) (a defendant may ask the court to "direct the government to file a bill of particulars" to clarify the nature of the charges against him).  To be legally sufficient,

-27-

an indictment need only track the language of the statute and, if necessary to apprise the defendant "of the nature of the accusation," state time and place in approximate terms. *Russell v. United States*, 369 U.S. 749, 765 (1962) (internal quotation marks omitted).

Here, the First Superseding Indictment and the Second Superseding Indictment, like the original indictment, charged Ng in three counts: conspiring, in violation of 18 U.S.C. § 371, to violate the FCPA anti-bribery provisions (Count One) and to violate the FCPA internal-accounting-controls provisions (Count Two), and conspiring to violate money laundering provisions, in violation of 18 U.S.C. § 1956(h) (Count Three). All three indictments alleged that Ng and his coconspirators committed those violations by, *inter alia*, causing Goldman to participate in three specified 1MDB bond offerings that yielded several billion dollars and send the net proceeds to 1MDB, and causing a 1MDB subsidiary to send nearly half of the amount 1MDB received to the coconspirators to allow the payment of bribes to government officials of Malaysia and Abu Dhabi, kickbacks to other facilitating participants, and kickbacks to the coconspirators themselves. The fact that S-1 and S-2 identified additional acts by Ng in furtherance of those conspiracies did not alter the nature of the conduct alleged or of the charged offenses.

As neither the First Superseding Indictment nor the Second Superseding Indictment charged Ng with offenses other than the three offenses alleged in the original indictment, Ng's claim that the government was contractually barred from filing these superseding indictments is meritless.

C. *The Evidentiary Challenge*

Ng denied that he had been a participant in the conspiracy to embezzle 1MDB funds and bribe Malaysian and Abu Dhabi officials. He contended that the $35.1 million transmitted to the account of his mother-in-law were not kickbacks from the 1MDB projects; and in support of that contention, Ng's wife Hwee Bin Lim ("Lim" or "Hwee Bin") testified at trial that the $35.1 million were instead returns from a business investment that her family had made with the family of Leissner's wife Judy Chan in 2005.

Prior to trial Ng moved for an *in limine* ruling that would allow him to introduce in evidence a videotaped conversation between Lim and Leissner that took place on October 16, 2018 (the "Lim-Leissner October 2018 Call" or "October Call")-- after Leissner had been arrested and was cooperating with the government, but before the indictment was unsealed. In that conversation, "[a]fter exchanging

pleasantries, Leissner and Lim began discussing the investigations and demands of Malaysian authorities," and "Lim stated that the Malaysian authorities had started requesting forfeiture of funds they believed were obtained illicitly." (Ng brief on appeal at 26 (citing Ng's Appendix on Appeal ("A.") 199-200).) The transcript attached to Ng's motion added, *inter alia*,

> [Lim]: . . . . I told them, I said, "no, you cannot just forfeit. Because how can you just forfeit without no, I mean, you want me to just sign an SD [*i.e.*, surrender declaration (*see* A.205)] to say that you know, you want, you want, you want me to surrender."

> Leissner: Mhm.

> Lim: Right? I said "I cannot just sign an SD to just say I want to surrender because I am telling you the truth. I'm telling you because there is a real business ongoing uh--there was business."

> Leissner: Mhm.

> Lim: And that's how the whole thing happens that way. So, they said, "oh you know, because you cannot provide me any form of documents and what's so, what not, how to prove that the, that the, whole thing is yours."

> Leissner: You mean the Capital Place money right? You mean the Capital Place money?

> Lim: Mm, mm, correct. So, I said "that is so crazy because this thing happened like way back in 2005 and then, you know, the whole and then the investment starts and then we decided to

wind down in 2011. And why is it you're doing this to me. I mean, who kept documents since those days?"

(A.200-01.)

Lim said the Malaysian authorities were saying she should "provide . . . documentation" (A.202). She said,

> [s]o, just, just start as a friend, just wanted to see if there is anything, um, you know. But, uh--

> Leissner: Nothing.

> Lim: Whether we have any form of documents, and I mean if you could help me with any form of--

> Leissner: Oh, I got you, you mean with Capital Place, with Judy?

> Lim: Yeah, if she still kept any, any, any, any form of documents. If I could contact her.

> Leissner: Yeah, maybe so, maybe so. I would have to tell--I would have to speak with her.

(A.203.) Eventually, Lim said,

> what I'll do is I'll try to reach out to her myself and then ask her whether she still has any form of our documents prior to all those things and then we'll see how it goes from there.

> Leissner: Okay. I think that's perfect, Hwee Bin.

(A.208.)

Ng argued to the district court that the recording would reliably establish that the $35.1 million transferred to his mother-in-law's account were returns on his wife's family's 2005 investments, not Ng's share of the 1MDB bribe proceeds, and that there was no hearsay impediment to its admission. He argued that Lim, rather than making statements offered for the truth of their contents, was merely asking questions, which could not be considered hearsay. Ng also argued that even if Lim's statements were hearsay, they were admissible under the Rule 803(3) exception for statements of the declarant's state of mind; or under Rule 106 in the interest of "completeness," to show that Leissner had been lying to Lim in a June 2018 conversation ("June conversation" or "June Call") that would be introduced in evidence by the government; or under Rule 807, the residual exception for hearsay for statements that are, *inter alia*, supported by sufficient guarantees of trustworthiness.

In a Memorandum and Order filed on February 11, 2022 ("*Ng II*"), the district court denied Ng's motion, noting, *inter alia*, that many of the statements in the October Call were excludable because they in fact involved hearsay within hearsay. As to Ng's Rule 803(3) contention, the court noted that that exception applies to "'[a] statement of the declarant's then-existing state of mind (such as motive, intent, or

plan),'" but it "permits the admission only of statements of *future* intent." *Ng II* at 27 (quoting Fed. R. Evid. 803(3) (emphasis ours)). The court found this exception inapplicable to the October Call because Ng sought to introduce it "not to establish some relevant aspect of Lim's future-facing intent to obtain documents but rather to prove conduct or events that occurred significantly earlier in time, circa 2005-2011." *Ng II* at 28 (internal quotation marks omitted) (citing *United States v. Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991) ("*Cardascia*") ("To admit statements of one's state of mind with regard to conduct that occurred eight months earlier . . . would significantly erode the intended breadth of this hearsay exception.")).

As to Ng's invocation of Rule 106 and the claimed goal of completeness, the district court found that the October 2018 Call was not needed to explain or place in context statements by Leissner in the June Call because the court's previous *in limine* order had ruled that June conversation admissible only as "background information" to show that Leissner was then cooperating with the government. *Ng II* at 15 (internal quotation marks omitted). The court also declined to admit the October Call under Rule 106, noting that it had discretion to exclude a defendant's post-hoc explanations for criminal conduct, *see id*. at 31-32; and it found that call inadmissible under Rule 807 because it found "there are numerous reasons to doubt

-33-

the trustworthiness of Lim's statements," *id*. at 34.

We see no merit in Ng's challenges to these rulings. "The [district] court's ultimate decision to admit or exclude a proffered statement is reviewed for abuse of discretion." *United States v. Gupta*, 747 F.3d 111, 124 (2d Cir. 2014), *cert. denied*, 575 U.S. 962 (2015); *see, e.g.*, *United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012), *cert. denied*, 571 U.S. 819 (2013). "A district court has 'abuse[d] its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence,' *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 . . . (1990), or rendered a decision that 'cannot be located within the range of permissible decisions,' *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)." *CFTC v. Walsh*, 712 F.3d 735, 749-50 (2d Cir. 2013) (other internal quotation marks omitted).

"Whether a statement is hearsay is a question of law, which we review *de novo*"--as is the question of "[w]hether the district court correctly construed the hearsay rule." *United States v. Ferguson*, 676 F.3d 260, 285 (2d Cir. 2011) (internal quotation marks omitted). "However, a district court's hearsay rulings based upon factual findings or the exercise of its discretion warrant additional deference." *Id*. The court's preliminary findings as to the presence or absence of facts that are preconditions to admissibility are reviewed only for clear error. *See, e.g., United States*

-34-

*v. Thai*, 29 F.3d 785, 814 (2d Cir.), *cert. denied*, 513 U.S. 977 (1994). Ultimately, we "will disturb [the trial court's evidentiary] rulings only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. Skelos*, 988 F.3d 645, 662 (2d Cir. 2021) (internal quotation marks omitted).

We see no error in the district court's application of the relevant hearsay principles.  To begin with, we reject Ng's contentions that in the October 2018 Call Lim merely asked questions, and that questions are admissible as nonhearsay because they are not offered for the truth of the matter asserted.  The transcript itself shows that almost none of what Lim said in that conversation--including her references to a past family investment--was a question.  (*See, e.g.*, A.200 ("there is a real business ongoing uh--there *was business*" (emphasis added)); *id*. at 208 ("I'll try to reach out to her myself *and then ask* her *whether she still has* any form of *our documents*" (emphases added)).)

Further, while declarative "[s]tatements may occasionally be offered, not to prove their truth, but solely for the limited purpose of proving that they were made[, t]hey may be admitted . . . only *if the mere fact that they were made is relevant* to some issue in the case." *United States v. Harwood*, 998 F.2d 91, 97 (2d Cir.) ("*Harwood*") (emphasis added), *cert. denied*, 510 U.S. 971 (1993).  If the mere "fact that [the

declarant] made the statement . . . is *ir*relevant," it is not admissible to show that she made it; and if "[w]*hat would be relevant* is" *the content* of what she said, then "*the statement is irrelevant unless it was true, in which case it would be hearsay.*" *Id*. (emphases added). *See, e.g., United States v. Torres*, 794 F.3d 1053, 1056 (9th Cir. 2015) ("although some questions and inquiries may constitute non-hearsay[,] *where the declarant intends the question to communicate an implied assertion and the proponent offers it for this intended message, the question falls within the hearsay definition*" (emphasis added)), *cert. denied*, 578 U.S. 978 (2016).

In the present case, Lim's key statements to Leissner--even if treated as questions--present a version of the classically objectionable "When did you *stop beating* your wife" question that assumes, without foundation, a prior beating. To the extent that Lim may be viewed as "ask[ing]" (Ng brief on appeal at 37) whether Leissner's wife "*still* kept any, any, any, any form of *documents*" (A.203 (emphases added)), that question plainly implies the prior occurrence of a documented event. But the mere fact that Lim asked that question is irrelevant to any issue in this case. What would be relevant is the suggested event; and Lim's statement or question was not relevant unless her implication that there had been such an event was true, in which case it would be hearsay. The district court correctly identified the only

-36-

relevant parts of Lim's statements as hearsay, embedded in the proffered hearsay videotape.

Indeed, the fact that Lim's statements--whether or not characterized as "questions"--were premised on there actually having been a 2005 investment by her family in Chan's business is made all the clearer by the significance that Ng attributes to Leissner's noncommittal "Mhm" responses. Ng says it is "relevan[t]" that "[w]hen Ms. Lim asks numerous times for records establishing the investment, Leissner does not once challenge *Ms. Lim that the investment happened*." (Ng brief on appeal at 37 (emphasis added).) But this argument by Ng makes no sense unless Lim's statements or implications that the investment happened are being offered for their truth; otherwise, there was nothing for Leissner to challenge or deny, and no relevance to his "Mhm[s]."

The district court's ruling that Lim's relevant hearsay statements did not meet the standards for the Rule 803(3) exception allowing admission of statements showing a present state of mind was also correct. Such statements are not admissible under this Rule if they are offered "to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Fed. R. Evid. 803(3); *see, e.g.*, *Harwood*, 998 F.2d at 98 (the purpose of the requirement that "the statement must face

-37-

forward, rather than backward" is to increase the "'unlikelihood of deliberate or conscious misrepresentation'" (citing *Cardascia*, 951 F.2d at 487)).

Nor did the district court err or abuse its discretion in rejecting Ng's contentions that the October 2018 Call should be admitted under Rule 106's provision for context or completeness. As the court noted, admission under Rule 106 would have been, at best, redundant.

Finally, admission under Rule 807's Residual Exception neither was needed nor would have been appropriate. It was not needed because Lim was a witness at trial. She testified that the $35.1 million received in her mother's account were returns on a legitimate family investment; she testified, "I contacted Judy because I needed to get the documents from her, the document that we signed back in 2005 on my family's investment into Judy's family, . . . . and any other documents that Judy could help me to show that my family indeed invested with her company." (Tr.4823-24.) And the ruling that the October 2018 Call was not admissible under Rule 807 was correct in light of the "numerous reasons to doubt the trustworthiness of Lim's statements" in that call.

In sum, there was no error or abuse of discretion in the district court's exclusion of the video recording of the October 2018 conversation between Leissner and Lim.

D. *The $35.1 Million Forfeiture*

The forfeiture sections of Title 18 provide, in pertinent part, that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense," "is subject to forfeiture to the United States," 18 U.S.C. § 981(a)(1)(C), and that

> [*t*]*he court, in imposing sentence on a person convicted of an offense in violation of section 1956* . . . of this title, *shall order that the person forfeit* to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

18 U.S.C. § 982(a)(1) (emphases added).

The government asked the court to order Ng to forfeit $35.1 million, the amount received by Ng from the offenses. Ng opposed, arguing principally that Malaysia had already caused him and his family to forfeit the full proceeds (and more) alleged to have been derived from his crimes, and that the imposition of

forfeiture in this action would violate the Eighth Amendment's prohibition against excessive fines by destroying his ability to earn a future livelihood.

In a Memorandum and Order dated March 23, 2023, *see United States v. Ng Chong HWA*, No. 18-CV-538, 2023 WL 4194002 (E.D.N.Y. Mar. 23, 2023) ("*Ng III*"), the district court noted that, so long as the factual predicates for these sections are satisfied, forfeiture is mandatory, and thus, "'a district court has no discretion not to order forfeiture in the amount sought.'" *Id*. at *1 (quoting *United States v. Viloski*, 814 F.3d 104, 111 n.11 (2d Cir. 2016) ("*Viloski*"), *cert. denied*, 580 U.S. 1171 (2017)). Therefore, "district courts are bound *not* to reduce the amount of a mandatory criminal forfeiture order by the amount of past or future restitution payments, in the absence of specific statutory authorization to do so." *Ng III*, 2023 WL 4194002, at *1 (emphasis ours) (citing *United States v. Bodouva*, 853 F.3d 76, 78-79 (2d Cir. 2017) ("*Bodouva*")). And the fact that a defendant has already forfeited a sum to another sovereign as a form of punishment for the same conduct is not a basis to reduce the forfeiture amount. *See Ng III*, 2023 WL 4194002, at *1-*2 (citing *United States v. Williams*, 519 F. App'x 303, 304 (5th Cir. 2013) ("*Williams*"), and *United States v. Pena*, 67 F.3d 153, 155-56 (8th Cir. 1995) ("*Pena*")). Applying these principles in the present case, the district court concluded that it was "statutorily required to order forfeiture

in the full amount sought by the government, thirty-five million one hundred thousand dollars and zero cents ($35,100,000.00)." *Ng III*, 2023 WL 4194002, at \*1.

As to Ng's constitutional objection to forfeiture, the district court noted that

> "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). To determine whether a fine is constitutionally excessive, courts consider the following factors: "(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by defendant's conduct." *Viloski*, 814 F.3d at 113 (citation omitted). The Second Circuit has held that the factors are non-exhaustive and that district courts may also consider the effect the forfeiture amount would have on the defendant's livelihood. *Id*.

*Ng III*, 2023 WL 4194002, at \*2.

Applying "these factors, and consider[ing] the fact that Ng already relinquished a large sum to Malaysia," the court found that each factor undercut Ng's claim that the requested forfeiture would be excessive. *Id*. It found

- that Ng had "willfully engaged in a multi-year financial scheme";

- that Ng did "not dispute that he fits into the class of persons for whom

-41-

the statute exists";

  - that the size of the requested forfeiture--the amount Ng was proven to have received--was not disproportionate to the size of an applicable fine, which, for conspiracy to engage in money laundering in this case, could have been double the amount he received; and

  - that "[t]he scheme resulted in enormous tangible harm, *i.e.*, the theft of $3 billion dollars, and intangible harm to the public's confidence in democracy and government," as Ng "played a role in one of the largest financial crimes of all time."

*Id*. at *2-*3 & n.1. And as to Ng's assertion that the forfeiture would deprive him of his future ability to earn a livelihood, the court noted that "to the extent that" that is "relevant to" the proportionality analysis of "the challenged forfeiture, . . . Ng has based his argument entirely on his present personal circumstances and has not shown that he will be unable to earn money in the future." *Id*. at *3 (internal quotation marks omitted).

  On appeal, Ng contends principally that the forfeiture was unconstitutionally excessive because, he states, "there can be no doubt that the forfeiture imposed will destroy Ng's future livelihood, given the size of the judgment and that Ng and his family have *already* ceded to Malaysia the full proceeds allegedly derived from the crime, and much more." (Ng brief on appeal at 60 (emphasis in original).) Ng also contends that money-judgment forfeitures are not authorized by

-42-

the applicable statutes but notes that he so argues only in order "to preserve the issue," acknowledging that it "is foreclosed by" this Court's existing precedents. (*Id.* at 61 n.9.) We discuss only Ng's constitutional objection, which we conclude is without merit.

The Eighth Amendment to the U.S. Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "'The burden rests on the defendant to show the unconstitutionality of the forfeiture.'" *Viloski*, 814 F.3d at 109 (quoting *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010), *cert. denied*, 562 U.S. 1251 (2011)).

The Supreme Court in *United States v. Bajakajian*, 524 U.S. 321 (1998), held that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 334. The Court stated that

> [i]n applying this standard, the district courts in the first instance, and the courts of appeals, reviewing the proportionality determination *de novo*,[10] *must compare the amount of the forfeiture to the gravity of the defendant's offense*. If the amount of the forfeiture is *grossly* disproportional to the gravity of the defendant's offense, it is unconstitutional.

[FN]10 .... The factual findings made by the district courts in conducting the excessiveness inquiry, of course, must be accepted unless clearly erroneous. See *Anderson v. Bessemer City*, 470 U.S. 564, 574-575 . . . (1985). But the question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate. See *Ornelas v. United States*, 517 U.S. 690, 697 . . . (1996).

*Id*. at 336-37 & n.10 (emphases added).

In *Viloski*, in which the defendant contended, as Ng does here, that the forfeiture ordered by the district court would deprive him of his future ability to earn a living, we noted that our Court has interpreted *Bajakajian* as requiring consideration of the following four factors, which have become known as the "*Bajakajian* factors":

(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

*Viloski*, 814 F.3d at 110 (internal quotation marks omitted).

We also noted *Bajakajian*'s extended discussion of the English constitutional tradition, including Magna Carta, which required that a fine "'should not deprive a wrongdoer of his livelihood,'" and we reasoned that "it seem[ed] unlikely that the *Bajakajian* Court meant to preclude courts from considering whether

-44-

a forfeiture would deprive an offender of his livelihood." *Id*. at 111 (quoting *Bajakajian*, 524 U.S. at 335). However, mindful of the Supreme Court's admonitions that "'judgments about the appropriate punishment for an offense belong in the first instance to the legislature,'" and that "[o]ur role in reviewing criminal forfeitures is solely to examine them for gross disproportionality," we concluded that in contemplating or reviewing a criminal forfeiture in light of the excessive Fines Clause, a court may consider whether the forfeiture would deprive the defendant of his future ability to earn a living--but only as a component of the proportionality determination, not as a discrete factor or in a separate inquiry. *Viloski*, 814 F.3d at 112 (quoting *Bajakajian*, 524 U.S. at 336).

We reasoned that a contrary interpretation "would be untenable in view of the Supreme Court's insistence that legislatures have the primary responsibility--subject, of course, to constitutional constraints--for 'determining the types and limits of punishments for crimes[,]' *Bajakajian*, 524 U.S. at 336," and "would conflict with one of Congress's basic premises in providing for criminal forfeitures: that forfeitures should be concerned *not* with how much an individual *has*[,] *but with how much he received in connection with the commission of the crime*." *Viloski*, 814 F.3d at 113 (other internal quotation marks omitted) (emphases ours).

In the present case, reviewing the district court's factual findings only for clear error, we see no such error. As described above, the court, in assessing whether the requested forfeiture was grossly disproportional to the gravity of Ng's offenses, correctly addressed all of the *Bajakajian* factors. It found that Ng had willfully participated in a multi-year financial scheme; that in that scheme he received $35.1 million; that the government asked that he be required to forfeit that amount; and that the requested forfeiture amount is only half as much as he could have been fined. As to the gravity of the crime, the court noted that the scheme was "one of the largest financial crimes of all time," involving the theft of some "$3 billion dollars" from the Malaysian people and causing enormous "intangible harm to the public's confidence in democracy and government." *Ng III*, 2023 WL 4194002, at *3.

The court also remarked that a future-livelihood-destruction objection might in some circumstances be relevant to the disproportionality analysis, but that Ng had addressed only "his present personal circumstances and ha[d] not shown that he will be unable to earn money in the future." *Id*. The district court's factual findings are well supported by the record.

Nor do we find any error in the district court's proportionality analysis in our review *de novo*. While Ng contends that "the district court should have . . .

-46-

conducted a more probing inquiry into whether the forfeiture would be ruinous to Ng's ability to earn a livelihood in the future" (Ng brief on appeal at 60 (internal quotation marks omitted)), this argument is belied by the record. Ng's initial response to the government's request for forfeiture argued simply that "the imposition of a $35.1 million forfeiture order would violate the 8th Amendment prohibition on excessive fines" because "there [was] no dispute that Malaysia has taken possession of eleven accounts containing 1MDB funds and other untainted funds." (Ng Opposition to Motion for Forfeiture at 6 n.2 (D.Ct. Dkt. No. 235).) The district court, noting that Ng's constitutional objection was only "fleetingly mentioned in footnote 2" of his opposition, promptly ordered a more complete exposition with respect to Ng's constitutional objection. Ng responded with a seven-page letter, most of which discussed legal precedents, and otherwise reiterated that "ordering $35 million in forfeiture will destroy Mr. Ng's ability to earn a future livelihood" (Ng's March 18, 2023 Letter at 1 (D.Ct. Dkt. No. 237)); that "Ng ha[d] already paid the Government of Malaysia a huge sum of money that includes the full proceeds of the crime and, based on the current value of" shares of stock he gave up, "was far more than the forfeiture order requested by the Government" (*id*.); that Ng had become "destitute," having incurred legal fees and living expenses during the prosecution (*id*.

at 6); and that "Ng and his family ha[d] already forfeited at least $29.6 million to the Government of Malaysia" (*id*. at 7).

The very concept of proportionality involves comparisons. But Ng never compared the requested forfeiture with the gravity of the offense. His only comparisons were between his role and the roles of Low and Leissner in the scheme, contending that he was far less culpable than they, and between his punishment and the punishment imposed on Leissner who cooperated with the government and was spared from imprisonment and was not asked to forfeit the entire amount he received in the scheme. (*See id*. at 5.) Ng's submissions in opposition to forfeiture evinced no consideration of the gravity of his offense or the damage caused to the victims. Indeed, his position is that "the harm caused . . . to the Malaysian people . . . is simply not what this case is about." (*Id*.)

The district court correctly found that the government had proven by at least a preponderance of the evidence that Ng received $35.1 million from the offenses. As to Ng's argument that he had already forfeited more than $35.1 million to Malaysia, the district court properly noted that such a forfeiture provided no basis for ordering that the forfeiture in this criminal case be less than the amount requested. We agree with the decisions of our Sister Circuits in *Pena*, 67 F.3d at 155-56, and

*Williams*, 519 F. App'x at 304, that the fact that the defendant has been ordered by another sovereign to forfeit assets for the same offense of which he is convicted in a United States court cannot be the basis for reducing the requested amount of a mandated criminal forfeiture. Our Court has ruled that "in the absence of specific statutory authorization to do so," the district court also cannot properly "reduce the amount of a mandatory criminal forfeiture" on account of an order that requires the defendant also to pay "restitution." *Bodouva*, 853 F.3d at 78-79. The analogy of Ng's case to *Bodouva* is especially appropriate given that 1MDB, an instrumentality of the Malaysian government, was the direct victim of the embezzlements perpetrated by Ng and his coconspirators; whatever assets Ng has been forced to turn over to Malaysia might well be viewed as restitutive, rather than, as Ng and Lim have characterized it, a duplicative forfeiture.

We see no basis on which to conclude that Ng's forfeiture of $35.1 million, his share of the embezzled funds, would be grossly disproportional to the gravity of his offense--his participation in "one of the largest financial crimes of all time" that, in the words of the district court, robbed the Malaysian people of "$3 billion dollars" and of "confidence in democracy." *Ng III*, 2023 WL 4194002, at *3.

-49-

## CONCLUSION

We have considered all of Ng's arguments on this appeal and have found them to be without merit.  The judgment of the district court, including the order of forfeiture, is affirmed.